## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## Civil Action No. 3:23-cv-160

|  |  |
|---|---|
| CHRISTOPHER JOHN BILLESDON, | |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WELLS FARGO SECURITIES, LLC, | |
| Defendant. | |

Plaintiff Christopher John Billesdon ("Plaintiff" or "Mr. Billesdon") brings this action for violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.§ 12101, et seq., the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq. ("ADEA"), and wrongful discharge in violation of public policy under N.C. Gen. Stat. § 143-422.1, and alleges the following:

### PARTIES

1.      Mr. Billesdon is a resident of Charlotte, North Carolina.

2.      Wells Fargo Securities, LLC, ("Defendant" or "Wells Fargo") is a North Carolina corporation, registered to do business in North Carolina, with its principal office located at 550 South Tryon Street, 6th Floor, D1086-060, Charlotte, North Carolina 28202.  Defendant employed Mr. Billesdon during the events giving rise to this action.

### JURISDICTION AND VENUE

3.      This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under ADA and ADEA, because the claims arise under the laws of the United States.

4.      This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Charlotte, North Carolina, which is located within this judicial district.

5.      At all relevant times, Defendant was an "employer" within the definition of ADA, 42 U.S.C. § 12101, et seq. (specifically, 42 U.S.C. § 12111(5)) on the basis that it employs more than 15 employees.

6.      At all relevant times, Defendant was an "employer" within the definition of ADEA, 29 U.S.C. § 621, et seq. (specifically 29 U.S.C. § 630(b)) on the basis that it employs more than 20 employees.

7.      At all times relevant to this action, Defendant possessed and exercised the power and authority to direct, control and supervise the work performed by Mr. Billesdon.

8.      At all relevant times, Plaintiff was an "employee" of Defendant within the definition of ADA, 42 U.S.C. § 12101, et seq. (specifically, 42 U.S.C. § 12111(4)).

9.      At all relevant times, Plaintiff was an "employee" of Defendant within the definition of ADEA, 29 U.S.C. § 621, et seq. (specifically 29 U.S.C. § 630(f)).

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was hired to work in this district and Defendant conducts business in this district.

## ADMINISTRATIVE EXHAUSTION

11.     Plaintiff satisfied his obligation to exhaust his administrative remedies by timely filing a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on disability and retaliation.

12.     Plaintiff filed a charge with the EEOC on August 2, 2022.

13.     The EEOC issued a Notice of Right to Sue on February 15, 2023.  Plaintiff timely brings this action within ninety (90) days of his receipt thereof.

2

14.     Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## **GENERAL ALLEGATIONS**

14.     Mr. Billesdon is a fifty (50) year old male born on May 22, 1972.

15.     Mr. Billesdon was employed by Defendant for nearly twenty-five (25) years.  His employment history with Defendant is as follows:

    a.  Vice-President/Director/Managing Director; Structured Products Sales/Charlotte, North Carolina: May 1997 - December 2003;

    b.  Managing Director; Head of West Coast Structured Product Sales/Los Angeles, California: January 2, 2004 - October 2004;

    c.  Managing Director; Head of West Coast Structured Product Sales/El Segundo, California: October 2004 - 2010;

    d.  Managing Director; Head of West Coast Asset Backed Finance Sales/El Segundo, California: 2010 - August 2020; and

    e.  Managing Director; Head of West Coast Asset Backed Finance Sales/Charlotte, North Carolina: August 2020 - February 24, 2022.

16.     Mr. Billesdon's annual performance evaluations at Wells Fargo reflect glowing commendations of, inter alia, his a) extraordinary sales production; b) ethics and compliance orientation; c) culture-carrying; d) mentoring of junior employees; e) indefatigable work ethic; and f) unfailing commitment to the betterment of the franchise. Mr. Billesdon engendered the considerable admiration from those senior, junior, and similarly situated to him and, for nearly a quarter of a century, he was widely viewed as a model and exemplary Wells Fargo employee.

3

17.     To illustrate the extraordinary production that Mr. Billesdon and his West Coast Team generated for Defendant and its shareholders, in Calendar Year 2020, Mr. Billesdon's West Coast Team generated roughly $64 Million of sales production, leading Wells Fargo to announce to the entirety of the salesforce that Mr. Billesdon's West Coast Team had done in excess of one trillion of notional bond sales risk.

18.     In Calendar Year 2021, Mr. Billesdon's West Coast Team generated roughly $61 million - $62 million of sales production, meaning that it essentially matched Calendar Year 2020 production. This was a truly remarkable accomplishment, especially when considering that the 2nd place Wells Fargo Team generated less than $40 million in sales production.

19.     During Mr. Billesdon's employment for Defendant, he was never subject to any complaints or disciplinary action.

20.     At all relevant times, Plaintiff was employed full-time by Defendant and worked at least forty (40) hours per week.

21.     Plaintiff received paychecks for his work performed for Defendant.

### *Mr. Billesdon's Documented Disability*

22.     Shortly after graduating high school in 1990, Mr. Billesdon was involved in a catastrophic accident in California which eventuated in, amongst other things, a) a fractured spine; b) a roughly one (1) month hospital stay, wherein he had to learn how to walk again; c) significant nerve damage resulting in the paralyzing of his colon and bladder that would never heal; and d) decades of medication intake (and trial and error) to assist in the production of bowel movements.

23.     Over the last several years, Mr. Billesdon has been prescribed, and has utilized, a combination of laxatives to counteract his colon/bladder paralysis and facilitate the production of bowel movements, respectively.  This combination of medications – which Mr. Billesdon took,

and takes, several days per week – results in massive bloating and cramping; however, it works reliably, such that when the medications kick in, Mr. Billesdon is able to produce bowel movements on average of every two (2) to three (3) hours.

24.     Approximately 25% of the time the medications taken by Mr. Billesdon do not begin working until late in the morning, which, in turn, generates considerable discomfort for Mr. Billesdon and, on those occasions wherein the medications do not work at all, Mr. Billesdon's day is extraordinarily painful, which, in turn, necessitates the addition of yet another medication which, while reliable, is laden with massive side effects.

25.     During Mr. Billesdon's lengthy employment in Wells Fargo's California offices, he was able to function in a manner that did not necessitate working from home, to wit, he would arrive at his California office at 4:45 AM and thereafter take his second dosage of medications when he entered the building (he would take his first dosage at home).

26.     There were only roughly fifteen (15) individuals employed in the office where Mr. Billesdon was employed by Defendant in California, and approximately 95% of the time the two (2) stall bathroom was unoccupied, and it was only a roughly ten (10) second walk to the bathroom from Mr. Billesdon's work area.

27.     When Mr. Billesdon's stomach cramped while working in Defendant's California offices, he could almost always make it to the bathroom without having an accident. Thereafter, Mr. Billesdon would stay in the bathroom or in the conference room outside of it so that he could run into the bathroom if needed, or alternatively, keep an eye on the bathroom so that he would know if the stalls were occupied.  If they were occupied, he would have to hurry downstairs to the public bathroom.

28.     Mr. Billesdon followed this successful and workable protocol for roughly ten (10) to twelve (12) years in Defendant's California offices.

29.     Mr. Billesdon re-located from Los Angeles to Charlotte during the global pandemic in August 2020, wherein he remained as the Head of West Coast Asset Backed Finance Sales within Wells Fargo Securities' Corporate & Investment Bank's Markets Division.

30.     Having visited the Trading Floor in Charlotte over the years from California – roughly six (6) - eight (8) times per year for sixteen (16) years – Mr. Billesdon knew that he could not work in Defendant's Charlotte office without some type of reasonable accommodation.

31.     The bathrooms in Defendant's Charlotte office were on the exact opposite side of the building from where his group was situated.  To this end, during his countless visits to said office over sixteen (16) years antecedent to August 2020, Defendant would permit Mr. Billesdon to work from his hotel and allow his medications to kick in as opposed to compelling him to work in an untenable situation.  Inasmuch as Mr. Billesdon – along with all others – were working from home during the global pandemic upon his relocation to Charlotte in August 2020, there was fortunately no immediate or pressing issue with which Mr. Billesdon had to deal vis-a-vis an accommodation.

### Defendant Illegally Retaliates Against Mr. Billesdon

32.     Before Mr. Billesdon's relocation from Los Angeles to Charlotte, he was informed by Brian Quintin Farrell ("Mr. Farrell"), a Managing Director and the Head of Spread Products within Wells Fargo Securities' Corporate & Investment Bank's Markets Division, that while working from home at Wells Fargo was no longer permitted, an accommodation would be made for Mr. Billesdon whereby he would be permitted to come into the office at or around noon on the days when he was taking his medications.

6

33. Mr. Farrell had formally exited Wells Fargo in June 2021 and there was increasing colloquy after Mr. Farrell's separation from the company about a potential, mandatory return to the office for all Wells Fargo employees.

34. Mr. Billesdon formally requested a reasonable accommodation in writing in late August 2021 with the assistance of an attorney and an ADA advocate. This accommodation request derived from the considerable health issues Mr. Billesdon faced delineated above.

35. In direct contravention of Wells Fargo Policy and Federal Law, respectively, Defendant inexplicably ignored this written request for roughly two (2) months.

36. Between the time when Mr. Billesdon formally requested an accommodation in writing in late August 2021 and the time when Wells Fargo dilatorily acknowledged said request several months later, Senior Company Management – Jennifer Ann Doyle ("Ms. Doyle") and Christopher Ralph Iannuzzi ("Mr. Iannuzzi"), both Managing Directors, in particular – began to exemplify a very different attitude towards Mr. Billesdon. For example, they each began to avoid, and cease contact with Mr. Billesdon, such that he had to attempt on numerous occasions to coax them into responding to him.

37. In short, there was a concerted plan in place to not communicate with Mr. Billesdon, such that he was forced to speak with only John Damon Templeton ("Mr. Templeton"), another Managing Director. In effect Defendant had isolated Mr. Billesdon and this isolation left him depressed and bereft of any meaningful internal dialogue.

38. Defendant engaged in overt stall and obfuscation tactics regarding Mr. Billesdon's accommodation request and requested documentation from medical personnel that was not in the slightest bit necessary.

7

39.     On December 31, 2021, Mr. Billesdon's accommodation request was improperly and illegally denied, ostensibly because Mr. Billesdon was already being accommodated in that he and everyone else were working from home and, if he became un-accommodated at some point by having to return to the office, he could then re-apply.

40.     At this time, a mandatory return to the office of all Wells Fargo employees was scheduled for March 15, 2022.

41.     In response to Defendant's denial of Mr. Billesdon's accommodation request, in early 2022, Mr. Billesdon reached out to Ms. Doyle in a final effort to make sure that she understood for what Mr. Billesdon was asking and why he felt that it should be a *fait accompli* to have granted.

42.     Ms. Doyle responded to said request by indicating that she would have breakfast with Mr. Billesdon to discuss his accommodation request and the details involving it, but purportedly could not do so for roughly three (3) weeks.  Mr. Billesdon patiently waited for the three (3) weeks to pass, and on the morning for which the breakfast was re-scheduled, Ms. Doyle canceled and indicated that she would re-schedule for a later date.

43.     After Mr. Billesdon finally got back on Ms. Doyle's calendar for another breakfast meeting following several attempts at the same, on the morning of said re-scheduling – February 21, 2022 – Ms. Doyle canceled yet again and stated that they could try again in a few weeks.

44.     The re-scheduling of the breakfast meeting between Mr. Billesdon and Ms. Doyle never occurred, inasmuch as Mr. Billesdon's employment was terminated without cause by Defendant on February 24, 2022.

45.     Notably, in one (1) of the many emails between the sides antecedent to Mr. Billesdon's termination without cause by Defendant on February 24, 2022, Defendant conceded

that there were many individuals requesting accommodations from Defendant but not related to disabilities. Hence, insofar as there was clear pressure from Senior Company Management to get people back to work in the office and not provide accommodations, it is clear that Defendant elected to terminate Mr. Billesdon's employment without cause on February 24, 2022, in retaliation for his accommodation request and to avoid making Defendant vulnerable to other employees citing to Mr. Billesdon's case and stating that they too should have been accommodated.

### *Defendant's Termination of Mr. Billesdon's Employment*

46.     On the morning of February 24, 2022, Mr. Billesdon was contacted via telephone by Mr. Iannuzzi and Nancy Lenart ("Ms. Lenart"), a Senior Human Resources Business Partner at Wells Fargo, whereupon Mr. Iannuzzi rather gleefully (and bizarrely) apprised Mr. Billesdon that he was being terminated without cause allegedly due to "cost-cutting."

47.     Whereas Defendant did not apprise Mr. Billesdon as to who else was being included in the Reduction in Force, Mr. Billesdon came to learn that one such individual was John Fitzgerald FitzHugh ("Mr. FitzHugh") – a fifty-six (56) year old, white, male Managing Director who had been employed by Defendant for thirty (30) years.

48.     Not coincidentally, Messrs. Billesdon and FitzHugh – two (2) older, white males – were the only two (2) employees included in the Company's Reduction in Force from Asset Backed Finance Sales.

49.     In the immediate aftermath of being apprised as to his inclusion in the Defendant's Reduction in Force, Mr. Billesdon was inundated with telephone calls from individuals expressing their condolences, and all the senior, key individuals with whom Mr. Billesdon spoke claimed to have not been aware ahead of time as to Mr. Billesdon's inclusion.

9

_Age Discrimination at Defendant Wells Fargo_

50.     Over the years, Defendant has had a propensity for engaging in illegal age discrimination, to wit:

   a.  Paul Booker Lothrop ("Mr. Lothrop") was a long-standing, outstanding salesperson and Managing Director for Defendant for over a quarter of a century. He was also one of the original First Union salespeople.  When he was in his early 60's and still a top-flight, exceptional salesperson, Mr. Farrell and Ms. Doyle – who had lamented for years that Mr. Lothrop was still in his seat and did not conceal their intentions in the slightest to replace him with a younger and more cost-effective salesperson – eventually orchestrated his termination. Prior to doing so, they brazenly mocked his eyesight and age and engaged in a pernicious campaign of age discrimination against him;

   b.  Mr. Billesdon routinely participated in discussions with both Mr. Farrell and Ms. Doyle wherein they explicitly articulated the need to get rid of Defendant's "graying" salesforce. They routinely begrudged that Richard Lyons Korzelius (hereinafter, "Mr. Korzelius") – a Managing Director, the Head of New York Asset Backed Finance Sales within Wells Fargo Securities' Corporate & Investment Bank's Markets Division, and a direct report of Mr. Templeton's, respectively – had "lost a step" and only covered one (1) big account and did not care about secondary trading at all;

   c.  Mr. Farrell and Ms. Doyle complained about Mr. FitzHugh being purportedly "too old," claiming falsely that he had "lost his vigor";

d.  Mr. Farrell had been contemplating for some time to oust Daniel Robert Wilken ("Mr. Wilken"), who is approaching sixty (60) years old and is therefore deemed to be "too old";

e.  Mr. Farrell and Ms. Doyle shamelessly mocked John Kenneth Abely, Jr.– a Managing Director – labeling him as "too old" and even referring to him as "grandpa" in the process;

f.  Mr. Farrell and Ms. Doyle were the two (2) largest proponents of getting rid of older, gray haired, white Managing Directors. Mr. Billesdson was one (1) of those individuals, and another was Mr. Lothrop. Another was Danny Kimbral Collins (hereinafter, "Mr. Collins") – a fifty-five (55) year old, white Managing Director and Wells Fargo's Head of Fixed Income Market & Portfolio Strategy, respectively – who was subject to the Reduction in Force in Calendar Year 2022 for alleged "cost-cutting purposes." Yet another was Mr. FitzHugh, who, as noted above, was included in the same Reduction in Force in which Mr. Billesdon was included. As further noted above, Mr. FitzHugh was a fifty-six (56) year old, white, male Managing Director who had been employed by the Company for thirty (30) years and, not coincidentally, Messrs. Billesdon and FitzHugh – two (2) older, white males – were the only two (2) employees included in the Company's Reduction in Force in Calendar Year 2022 from Asset Backed Finance Sales. And, of course, there are dozens more who were the victims of venal and illegal age discrimination at the hands of Wells Fargo; and

g.  Timothy Mullins ("Mr. Mullins") – a Managing Director and Wells Fargo's Chief Investment Officer, frequently disparaged Joe York ("Mr. York") and John

Fitzpatrick ("Mr. Fitzpatrick"), each in his mid-50's, referring to them as "old and lazy." With regards to each, there was an initiative by Defendant to move Portfolio Trading out of Las Vegas and back to New York near where Charles W. Scharf (hereinafter, "Mr. Scharf") – the Company's Chief Executive Officer, President, and a Member of its Board of Directors lives. This move triggered jobs moving from Las Vegas to New York. This resulted in Mr. York and Mr. Fitzpatrick having to interview on a sham basis as it was no secret that they would not be given jobs because they were "old white guys". As a result, Mr. York retired, and Mr. Fitzpatrick did not receive the job. After the Portfolio Investment team moved, Mr. Mullins demanded that all his sales coverage move to the East Coast from the West Coast.

51.     Mr. Billesdon therefore believes and avers that Defendant discriminated against him and terminated him due to his accommodation request, disability and/or age.

### *Wells Fargo's History of Regulatory Violations/Fraud*

52.     In 2020, Defendant undertook "Project Pencil," which involved the sale of $10 Billion of student loans. In connection therewith, Defendant invited a "who's-who" of investors to submit bids for the portfolio of loans in competition. These investors had weeks to work on the portfolio and each group expended massive amounts of time in analyzing, and honing in upon, the subject portfolio. One of Mr. Billesdon's accounts – PIMCO – was invited to participate in the auction. The auction had crystal clear rules advertised that there would be no "last looks" and that every account would be on equal footing.

53.     After a few rounds of bidding, Defendant narrowed down the bidders to the two or three purportedly best ones and PIMCO made it into the final group. When the final bids had been

submitted, it took an inordinately lengthy period of time for, ostensibly, the bankers to sort through the intricacies of the various bids to ascertain which bid represented the most advantageous economic outcome for Wells Fargo. In fact, the actual reason for the unusual delay was *not* because the bankers were attempting to extrapolate what was in the best interests of the Company and its shareholders but because Blackstone and another large financial institution, Apollo, had partnered up and made it clear to Charles W. Scharf ("Mr. Scharf") – the Company's Chief Executive Officer, President, and a Member of its Board of Directors, respectively – that if they were not awarded the portfolio, they would "put Wells in the box", meaning that they would cease doing business with Defendant for the foreseeable future. In fact, Mr. Scharf had personal relationships with the heads of these companies and they knew full well that Mr. Scharf needed them more than they needed him. In the end, Defendant awarded the portfolio to Blackstone and Apollo, which, of course, drew the considerable ire of PIMCO.

54. Upon Mr. Billesdon's learning what had transpired, he was fed the Wells Fargo Company line that PIMCO's bid was supposedly just a tad shy; however, PIMCO employees who were intimately familiar with, and privy to, the clandestine machinations that had transpired were adamant that its bid was irrefragably the best. To this end, they knew that an "inside deal" had surreptitiously occurred and that, correspondingly, Defendant did not obtain the best price for its shareholders in this auction.

55. Additionally, Defendant has no viable technology whatsoever; rather, its "technology" has been an amalgamation of disjointed and antiquated systems cobbled together after so many mergers over the years. To wit, Wells Fargo has had myriad bad hedges due to the unreliability of its risk system and, very recently, there was another large risk issue on the Mortgage Desk wherein the desk simply did not know what its position was. When this happens,

trading is supposed to cease but, in reality, employees were always instructed to keep trading and to never apprise clients as to the systems' infirmities. In short, Defendant has massive trepidation about losing market share. "Technology" – or the utter dearth thereof – has been one of Defendant's largest issues with the Regulators and the reason why a Consent Order on a "balance sheet" still exists.

56. Moreover, there have been clear-cut, prima facie failures by Defendant to supervise traders on the Mortgage Desk, with a half dozen out of ten (10) on vacation at one point while said desk was losing ~$75 Million+ in the Spec Book. In fact, as reported to Mr. Billesdon, there is a clear-cut, intentional mismarking of the Mortgage Book ongoing in the amount of ~$10 Million+.

57. Furthermore, an extraordinarily large swath of Defendant's salesforce has engaged in the unauthorized utilization of personal email, texts, and other social media channels for work purposes. Even Jonathan Geoffrey Weiss ("Mr. Weiss") – a Senior Executive Vice-President, formerly the Head of Wells Fargo's Wealth & Investment Management Division, the Chief Executive Officer of Wells Fargo Securities' Corporate & Investment Bank, and a Member of Wells Fargo's Operating Committee, respectively – texted Mr. Billesdon on manifold occasions from Mr. Weiss' personal device about Wells Fargo business issues, even doing so in as late as the fourth quarter of 2021 concerning Mr. Billesdon's accommodation request. Whereby Mr. Weiss was, and is, at the top of the totem pole of Wells Fargo Securities' Corporate & Investment Bank, he was by no means an outlier amongst the Managing Director ranks at Wells Fargo that engaged in the unauthorized utilization of personal email, texts, and other social media channels for work purposes. To wit, Mr. Templeton and others in Syndicate and Trading routinely texted Mr. Billesdon on myriad occasions from their personal devices about Wells Fargo *business*

issues. Yet, notwithstanding, they each remain gainfully employed by Defendant, including Mr. Weiss.

58. When Mr. Iannuzzi was the Head of Mortgage-Backed Securities Trading within Wells Fargo Securities' Corporate & Investment Bank's Markets Division prior to becoming the Head of Asset Backed Finance Sales, Trading, and Syndicate within Wells Fargo Securities' Corporate & Investment Bank's Markets Division; and Mr. Billesdon was still based in Los Angeles, there was an "out trade" wherein a Wells Fargo Sales Assistant forgot to book a $50 Million trade. Prior to his retirement, Mr. Farrell had instilled in the salesforce that it was of utmost and paramount importance to immediately report any "out trades" and that anyone who tried to obfuscate a mistake/work-it out "quietly" would have committed a fire-able offense. When this particular $50 Million "out trade" came to Mr. Billesdon's attention, he immediately contacted Mr. Iannuzzi to make him aware of the same so that Mr. Iannuzzi could handle the risk and make certain that they apprised Mr. Farrell together as to what had transpired. However, Mr. Iannuzzi suggested not conferring with Mr. Farrell, inasmuch as, per Mr. Iannuzzi, Mr. Farrell was "unlikely" to find out about the trade. Further, Mr. Iannuzzi 'believed' that they could work through the risk that had arisen, i.e., Mr. Iannuzzi was advocating for steps to be taken that were precisely the opposite of those that had been mandated by Mr. Farrell.

59. When Mr. Billesdon apprised Mr. Iannuzzi that he was refusing to capitulate to this clear breach of Company Policy, and he intended to apprise Mr. Farrell as to what had taken place, Mr. Iannuzzi had no choice but to acquiesce. The eventual outcome aside, Mr. Iannuzzi was ready, willing, and determined to intentionally flout, and abdicate from, well-established FINRA and Wells Fargo Rules and Protocol, and certainly would have done so but for Mr. Billesdon's acts and exhortations to the contrary.

## *Other Egregious Conduct by Wells Fargo*

60.     One present, Senior Member of Company Management has a proclivity for not only consuming excessive amounts of alcohol with Wells Fargo Traders and Salespersons present but for then driving a car with such individuals as passengers in a highly inebriated state.  In so doing, said individual frequently (and cavalierly) risks not only his own life but the lives of myriad others as well.  On one particularly egregious occasion in the Summer of 2021 following an evening at a steakhouse in Charlotte, North Carolina with roughly eight present and former Wells Fargo employees in attendance (including Messrs. Billesdon and Farrell), said individual brazenly and recklessly drove several Wells Fargo employees home while exceedingly intoxicated.  One of the passengers in the car passed out from drinking too much alcohol and the present, Senior Member of Company Management who was driving while very much under the influence ended up driving around for an extraordinarily lengthy period of time because no one in the car actually knew how to locate the home of the passed-out passenger.  This is just one of a bevy of disturbing examples wherein this present, Senior Member of Company Management would consume excessive amounts of alcohol and then casually get behind the wheel of his car, oftentimes with Company subordinates present.  This pattern became so frequent that on no fewer than a dozen occasions did Mr. Farrell remark specifically to Mr. Billesdon that said individual "needs to cleanup his act or will otherwise end up in jail (or worse)."

61.     Defendant also has had an affinity for conducting "sham" interviews of black, female, and other "diverse" hiring candidates.  Sometimes, in fact, there was no job posting at all and Defendant did not even deign to undertake "sham" (or any) interviews at all, as was the case with hiring Mr. Iannuzzi and Mr. Templeton, two white males who received their present, Senior

positions in connection with which there was no job posting, competition, or consideration of a diverse candidate whatsoever.

## COUNT I

### Violation of Americans with Disabilities Act of 1990, as Amended
### 42 U.S.C.§ 12101, et seq

62.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

63.    Mr. Billesdon is a "person" and an "employee," and Defendant is an "employer" and a "covered entity" as those terms are defined at 42 U.S.C.§ 12101, et seq.

64.    At all relevant times, Plaintiff was a qualified individual with an actual or perceived disability.  Prior to Plaintiff's request for an accommodation pertaining to his disability, Plaintiff was performing his job at a level that met and exceeded his employer's legitimate expectations.

65.    Plaintiff notified Defendant of his colon/bladder paralysis and the combination of laxatives he must take to facilitate the production of bowel movements. Plaintiff further notified Defendant how the combination of the medications Plaintiff takes, several days per week, results in massive bloating and cramping, and that when the medications kick in, Plaintiff is able to produce bowel movements on average of every two (2) to three (3) hours.  Defendant further informed that approximately 25% of the time the medications taken by Plaintiff do not begin working until late in the morning, which combination of laxatives generates considerable discomfort for Plaintiff and, on those occasions wherein the medications do not work at all, Plaintiff's day is extraordinarily painful, which, in turn, necessitates the addition of yet another medication which, while reliable, is laden with massive side effects.

66.    During Plaintiff's lengthy employment in Defendant's California offices, he was able to function in a manner that did not necessitate working from home, where he would arrive at

his office at 4:45 AM and thereafter take his second dosage of medications when he entered the building after taking his first dosage at home.

67.     There were only roughly fifteen (15) individuals employed in the California office where Mr. Billesdon was employed, and approximately 95% of the time the two (2) stall bathroom was unoccupied, and it was only a roughly ten (10) second walk to the bathroom from Mr. Billesdon's work area.

68.     When Mr. Billesdon's stomach cramped while working in Defendant's California offices, he could almost always make it to the bathroom without having an accident. Thereafter, Mr. Billesdon would stay in the bathroom or in the conference room outside of it so that he could a) run into the bathroom if needed; or, alternatively, b) keep an eye on the bathroom so that he would know if the stalls were occupied. If they were occupied, he would have to hurry downstairs to the public bathroom.

69.     Mr. Billesdon followed this successful and workable protocol for roughly ten (10) to twelve (12) years in Defendant's California offices.

70.     Plaintiff informed Defendant that the bathrooms in Defendant's Charlotte office were on the exact opposite side of the building from where his group was situated. Before relocating to the Charlotte office, during his countless visits to said office over sixteen (16) years antecedent to August 2020, Defendant would permit Mr. Billesdon to work from his hotel and allow his medications to kick in as opposed to compelling him to work in an untenable situation.

71.     Defendant violated the ADA by failing to attempt to reasonably accommodate Plaintiff in violation of 42 U.S.C. § 12112(b)(5)(A), including but not limited to allowing Plaintiff to work from home and/or not allowing Plaintiff to come into the office at or around noon on the

days when he was taking his medications, even though such accommodation would not impose an undue hardship on Defendant.

72.     Defendant further violated the ADA by failing to engage in the interactive process in good faith in violation of 29 C.F.R. § 1630.2(o)(3).

73.     Defendant further violated the ADA by terminating Plaintiff based on an actual or perceived disability in violation of 42 U.S.C. § 12112(a).

74.     Plaintiff's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination without a legitimate business reason.

75.     Plaintiff has been damaged by Defendant's violation of the ADA as Plaintiff has suffered loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

76.     Plaintiff is entitled to his attorneys' fees and costs incurred in this matter pursuant to 42 U.S.C. § 12205.

77.     Plaintiff is further entitled to any and all relief permitted under the ADA, 42 U.S.C. § 12117(a), including equitable relief.

## COUNT II

### Discrimination and Retaliation on the Basis of Age
### Violation of ADEA, as amended

78.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

79.     Plaintiff was born in 1972 and was forty-nine (49) years old at the time of his termination.

80.     Defendant treated Plaintiff less favorably than substantially younger employees by terminating his employment and replacing him with much younger employees.

81. Defendant violated the ADEA by discriminating against Plaintiff in whole or in part because of his age and/or in retaliation for his protected activity of opposing age discrimination.

82. Defendant's acts described herein constitute a violation of the Age Discrimination in Employment Act's prohibition against age discrimination.

83. As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered lost wages and benefits, and other damages in an amount to be proven at trial. He is entitled to recover compensatory and liquidated damages in an amount to be proven at trial, including attorneys' fees and costs.

## COUNT III

### North Carolina Wrongful Discharge in Violation of Public Policy

84. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

85. Defendant employed at least fifteen (15) employees at all relevant times.

86. Defendant violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 by terminating Plaintiff because of an actual or perceived disability and/or because of his age.

87. Defendant violated the public policy by terminating Plaintiff after he exercised his rights and in good faith opposed what he viewed as injurious conduct as set forth in the paragraphs above.

88. As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

89. Defendant's actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

90. Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief:

1. An Order awarding Plaintiff damages for Defendant's violation of the ADA, including backpay, front pay, lost employment benefits, and any other compensation denied or lost because of Defendant's violation of the ADA;

2. An Order awarding Plaintiff damages for Defendant's violation of the ADEA, including backpay, front pay, lost employment benefits, and any other compensation denied or lost because of Defendant's violation of the ADEA;

3. An Order awarding Plaintiff compensatory damages for emotional distress, pain and suffering, inconvenience, and/or mental anguish in an amount to be proven at trial;

4. An Order awarding Plaintiff punitive damages under N.C. Gen. Stat. § 1D-115 in an amount to be proven at trial;

5. An Order awarding Plaintiff the costs of this action;

6. An Order awarding Plaintiff reasonable attorneys' fees;

7. An Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

8. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NC State Bar No. 26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Tel: (844) 437-7637; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*/s/ John D. Singer*
John D. Singer
SINGER DEUTSCH LLP (*Pro Hac Vice Forthcoming*)
1 Penn Plaza, Suite 3358
New York, NY 10119
Tel: (212) 682-4224; Fax: (212) 682-2006
Email: jds@singerdeutsch.com

*Attorneys for Plaintiff*