UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:23-cv-160

| | |
|---|---|
| **CHRISTOPHER JOHN BILLESDON**, <br><br> Plaintiff, <br><br> v. <br><br> **WELLS FARGO SECURITIES, LLC,** <br><br> Defendant. | **PLAINTIFF'S RESPONSE IN OPPOSITION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I. BOTTOM LINE UP FRONT

Like most employer defendants filing summary judgment motions, Defendant Wells Fargo Securities, LLC ("WF") only offers the Court a cherry-picked selection of the facts that is handcrafted to conform to its false narrative. WF's own documents and deposition testimony provide a far more accurate historical context for the Court to determine if genuine issues of fact exist on Billesdon's discrimination claims. Moreover, WF's legal analysis is as incomplete as its selective factual narrative. Applying the entirety of the facts, to the correct law, establishes that WF is not entitled to judgment as a matter of law on any issue and the Court should deny WF's motion for summary judgment in its entirety.

## II. SUMMARY OF ARGUMENT

While it may be true that most Fourth Circuit cases tend to uphold an employer's RIF as a legitimate and non-discriminatory business reason, this is not most cases. Here, Billesdon can forecast plenty of evidence casting disturbingly real doubt on the veracity of WF's proffered explanation for his termination. This is most certainly not a case where the terminated employee

1

is asking the Court to second-guess the business judgment of the employer or act as a "super-HR." Billesdon can provide much more than his own subjective beliefs to establish that his termination was a pretext for discrimination. Indeed, WF's own paper trail shows that the same decision-makers who determined Billesdon would be required to return to the office after COVID just like all other salespeople, regardless of his disability and requested accommodation to work from home, are also the same decision-makers who suddenly reopened a final, and approved RIF, just to add Billesdon's name to it *on the very day* they received definitive medical documentation that WF's in-office accommodation would not be effective for Billesdon and he needed to work from home. And then, these same two decision-makers proceeded to carry out the RIF against Billesdon in record time and without following any of WF's written required procedures or applying the purported "neutral" RIF criteria in a non-discriminatory manner. Thus, there is both direct and indirect evidence of pretext that does not require this Court to sit as a super-HR or otherwise question WF business judgment.

In short, WF's own documents show that there were two parallel tracks running behind the scenes at WF and each one supports liability for the other. That is, the evidence of the shenanigans going on around Billesdon's accommodation request to work from home, and the sham interactive process WF engaged in, allow a jury to find that the contemporaneous RIF was a sham. And vice versa - the evidence of the shenanigans going on around the sham RIF allows a jury to find that WF failed to accommodate Billesdon and did not engage in good faith. Both violated the ADA, just different aspects of it. And the additional evidence that one of these decision-makers also repeatedly disparaged older workers for their age-related conditions is just icing on this very disturbing cake.

## III. ADDITIONAL MATERIAL FACTS

**A.  Additional undisputed facts related to failure to accommodate.**

In the interests of space, Billesdon refers the Court to the undisputed facts set forth in his summary judgment motion showing that WF failed to accommodate him. [Doc. Nos. 58 and 59-1 through 59-31] Although this evidence is sufficient to establish genuine issues of material fact, Billesdon has also responded specifically to each of Wells Fargo's facts on the topic. [Ex. 1]

Billesdon also refers the Court to the facts and evidence in support of his motion for summary judgment showing that his accommodation request was medically necessary. [Doc. No. 59-2, 59-3 and 59-26] In addition, Billesdon provides a detailed explanation of the history to further explain why working from home was medically necessary for him. [Ex. A[1] at ¶ 11-46]

**B.  Forecast of Evidence in response to WF Fact Nos. 19 - 26 demonstrating multiple issues with the RIF and how the criteria were selected and applied.**

In the interests of space and to explicitly show the Court how many of WF's purported undisputed facts are disputed, Billesdon will address each disputed fact related to the RIFF, in turn, using WF's paragraph numbers.[2]

**Fact No. 19:** WF claims it began the RIF that resulted in Billesdon's termination in Summer of 2021, to get out ahead of Billesdon's accommodation request. However, the Business Case is not dated August 18, 2021 and there are no contemporaneously-dated documents showing a business case was created on this date. In addition, Iannuzzi testified that the discussions around cost-cutting occurred in the fourth quarter, in the September/October/November timeframe. (Ex.

---

[1] All "Ex." citations refer to the Exhibits described and filed simultaneously with the Appendix in Support of Plaintiff's Response in Opposition of Defendant's Motion for Summary Judgment.

[2] Billesdon also provides the Court with a Forecast of Evidence in the Appendix (Exhibit 1) and an updated timeline (Exhibit 2) being filed in support of his Response, which is a separate statement that sets out WF's facts from its Motion and Billesdon's disputed facts in response. This document contains the same facts and evidence recited herein, but formatted differently for ease of reference.

3

D at 18:2-12) Iannuzzi also testified that 2021 was a "record year" and that is why he gave Billesdon such a high bonus of $2.6 million. (Ex. D at 394:2-15)

**Fact No. 20:** Iannuzzi did not first obtain a list of managing directors from HR. Instead, he testified that he and Doyle "came up with" a list of names. In fact, he testified "names are always coming up" and "popping up." (Ex. D at 74:19-75:3; 77:1-10; 229:12-20; 231:3-8; 387:3-13) Furthermore, Iannuzzi had never done a RIF before. (Ex. D at 318:21-319:10)

**Fact Nos. 21 and 22:** Iannuzzi admitted he chose FitzHugh first and filled out the ranking paperwork later. (Ex. D at 75:-77; 83:5-7; 228:18-229:11) He said he had discussions with management and Fitz's name came up and they targeted him to be displaced in a RIF. (Ex. D at 26:13-23)

**Fact No. 23, Sentence No. 1:** There is no evidence of a change in conditions after FitzHugh's RIF was finalized and approved. Robinette testified that he is not aware of any data points, expenses, costs, risk or otherwise that only for the first time became apparent to WF between November 16, 2021 and December 9, 2021. He further testified that all the information WF had when it decided to eliminate FitzHugh was the same information it had when it decided to eliminate Billesdon. (Ex. C at 134:6-18) Robinette also testified that he heard no prior discussion about expanding the initial Business Case and that no new information came in during these weeks in between. (Ex. C at 12:23-113:14)

**Fact No. 23, Sentence No. 2:** Iannuzzi requested the second candidate pool *after* he selected Billesdon on December 6, 2021 and tried to start a new Business Case. [Ex. K, WF00005348] At some point, his efforts must get rejected because then he revised the fully approved Business Case terminating FitzHugh and added the information for Billesdon's job code to it. [Doc. No. 59-16, WF-00004509] The font is different on the form for the two job codes, which

4

immediately struck Robinette as odd. He testified that it was not him who made those revisions even though he was the one who signed off on the original Business Case involving FitzHugh's job code. (Ex. C at 90:9-22)

**Fact No. 23, Sentence No. 3:** Templeton cannot possibly be a legitimate member of Billesdon's pool of candidates; he was put there to make the pool look bigger. In fact, Iannuzzi testified Templeton actually weighed in on who to put in the RIF pool and select. (Ex. D at 211:24-214:9) Also, Iannuzzi testified Templeton's name "in the discussion" but he was never going to be displaced with a RIF because they needed him. (Ex. D at 231:18-232:5) WF's Response to Interrogatory 11 states that there were 7 candidates, even though they were not all in the original pool. (Doc. No. 59-25) Doyle admitted that it is not documented anywhere that Iannuzzi used neutral categories, that there is no way to determine if Iannuzzi was objective and that he is the only one that knows if he used neutral categories. (Ex. G at 147:1-12; 158:6-161:3)

**Fact No. 23, Sentence No. 4:** Once again Iannuzzi *first* made the selection of Billesdon on December 6, 2021 and *then* did the ranking later. (Ex. D at 335:8-10) Yet, on December 16, 2021, Iannuzzi was instructed to validate that he has *completed the required training before* he can move forward with the ranking forms for the displacement of the WF Sec Sec Mgr 3 position. (Doc. No. 59-20) The Business Case metadata shows that Iannuzzi did not complete the ranking until January 7, 2022. (Ex. N) Robinette testified that it would be "impossible" to select the specific employee before the paperwork was completed. (Ex. C at 14:15-23)

**Fact No. 23, Sentence No. 5**: The criteria Iannuzzi used in the RIF are the same criteria used on the performance review that determine discretionary bonuses. Yet Billesdon's performance reviews show he received "exceeds" in all these categories (before he sought an accommodation for his disability). (Ex. A at ¶6; Doc. No. 59-24; Ex. S) Notably, in the Business Case documents,

WF did not check the box indicating performance reviews were considered, apparently so Iannuzzi could manipulate the results and claim Billesdon was lacking in these areas. (Ex. Q) Yet, Robinette testified that the core competencies would be in the performance reviews as well and, if there is an exceptional performer, it should be considered in the RIF. (Ex. C at 200:1625)

Iannuzzi's conclusions are also not borne out by any documented, objective evidence. Doyle admitted Billesdon had no performance issues. (Ex. F at 55:9-15) She also admitted she did not even ask Iannuzzi to do a performance rating because all the candidates were "good employees." (Ex. F at 120:4-121:9) Furthermore, Iannuzzi's conclusions that Billesdon was lacking in collaboration, leadership and product knowledge are without factual support. (Ex. A at ¶ 7-9).

**Fact No. 23, Sentence No. 6:** Billesdon was not part of a four-person team. Wells Fargo divided his sales credits evenly among team members to dilute his gross sales credits. (Ex. A at ¶ 10) Doyle admitted that Billesdon's team was top in sales and sales volume. (Ex. F at 125:18-20) She further admitted WF does not divide salespersons by team in the normal course of business and that she had never seen data broken down by team as WF did to decrease Billesdon's sales credits. (Ex. F at 180:23-186:4) Similarly, Billesdon has never, in 25 years, seen an individual with a sales credit number next to his name because it is a team model. (Ex. A at ¶ 10)

**Fact No. 24:** Iannuzzi already knew Billesdon was the highest paid of all candidates, so his decision to add 2020 compensation to the selection criteria for the second pool *ensured* that *only* Billesdon would be selected for termination. (Ex. D at 394:2-15)

**Fact No. 25:** Billesdon was added to an existing RIF that had already been fully approved on November 17, 2021, even though Billesdon had a different job code. (Doc. No. 59-15, WF-00005332) Billesdon's entire RIF process was then pushed through in 10 days. (Doc. No.

6

59-16, WF-00004509; Doc. No. 59-20, WF-00005410) The Revised Business Case that adds Billesdon's name does not go through all the levels of approval the original Business Case for FitzHugh went through because he was just stuck into an already-approved Business Case. (Doc. No. 59-10, WF-00005317; Doc. No. 59-11, WF-00005753; Doc. No. 59-12, WF-00005338; Doc. No. 59-13, WF-00005331; Doc. No. 59-14, WF-00005401; Doc. No. 59-15, WF-00005332)

Robinette, who has participated in over 100 RIFs, testified that he has never seen a Business Case contain two job codes and that should have caused the Business Case to get kicked back and not approved. (Ex. C at 176:18-177:13; 188:15-25; 190:1-194;1) Robinette also testified that, in the over 100 RIFs he has participated in, he has never seen a RIF get pushed through in two weeks; usually it takes a minimum of 90 days but typically longer. (Ex. C at 188:15-25; 190:1-24) Robinette further testified that the RIF has to go through multiple levels of review, employee relations, compliance, legal, and audit. (Ex. C at 103:22-24) Lenart confirmed this, testifying a displacement by RIF takes 4-6 months because the "go through such a lengthy review." (Ex. G at 18:13-21; 28:17-32:23; 169:15-177:16)

On November 30, 2021, Kogler in HR emailed Iannuzzi and Robinette telling them that the lead time for a "displacement" is 5+ months and they would have to have their rationales submitted by December 5, 2021 for an April 2022 termination. (Ex. I) Yet, Iannuzzi selected Billesdon on December 6, 2021 and WF terminated him on February 24, 2022.

**Fact No. 26:** Billesdon was not laid off "due to a RIF." (See all evidence cited in response to Facts 1 - 25 above) Further, the Candidate Pool for Billesdon's RIF failed to check the box indicated whether the candidate is disabled. (Ex. Q) Lenart testified that although she knew Billesdon was actively seeking an accommodation, she never looked at the details of the Candidate Pool. (Ex. G at 180:10-182:2) Even though she signed off on the Business Case four

7

days after Doyle contacted her about Billesdon's accommodation request, it did not raise any red flags. (Ex. G at 320:18-322:11) Lenart also did not reach out to Davis because she did not think it was her role and she believed RIFs are separate from disability issues and accommodation requests. (Ex. G at 51:18-21; 161:1-162:4) Lenart further testified that she did nothing to make sure the criteria were neutral; she just assumed. (Ex. G at 147:21-25) Doyle admitted she did not ask why the disability box was not checked on the Candidate Pool form. (Ex. F at 113:21-114:17) Doyle admitted she did not even ask Iannuzzi if he selected Billesdon because of his disability, despite everything she knew and had participated in. (Ex. F at 81:1-82:24)

## IV. LEGAL ARGUMENT

### A. WF is not entitled to judgment on Billesdon's failure-to-accommodate claim.

WF claims that it did not fail to accommodate Billesdon because (1) it was already providing a reasonable accommodation by allowing him to work from home during COVID; and (2) working from home was not a medically necessary accommodation. Both arguments fail.

#### 1. WF has not shown it fully accommodated and/or engaged in an interactive process in good faith with Billesdon.

In the interests of space, Billesdon refers the Court to his motion for summary judgment and the evidence attached thereto, to support its argument that WF, in fact, denied Billesdone's request to work from home indefinitely. [Doc. Nos. 58 and 59-1 through 59-31]

#### 2. WF has not shown the accommodation request was not medically necessary.

##### a. WF has already admitted the accommodation was medically necessary.

WF's own documents show that Davis, who is WF, deemed Billesdon's requested accommodation to be medically necessary and supported by his original medical documentation in his August 2021 request for accommodation. [Doc. No. 59-2 at WF-00003918]. She also told Billesdon's managers and others that the medical support was sufficient. [Doc. No. 59-2 at

8

Case 3:23-cv-00160-FDW-SCR   Document 62   Filed 02/02/24   Page 8 of 20

WF-00003916-18] WF cannot retroactively unwind Davis' determination, particularly since it hired Davis to do just that. See, *Price v. Bd. of Educ.*, 2023 U.S. Dist. LEXIS 121480, (Dist. Md., July 13, 2023 ("It is also noteworthy that HCPS itself already granted the accommodation of not standing for more than fifteen minutes . . . so the medical necessity of the accommodation is not at issue here.") The same is true here. Davis, the person hired to make such assessments, already agreed, on behalf of WF, that the medical documentation supported the need for the requested accommodation and she herself was pushing for that accommodation until she learned WF decided to terminate Billesdon. Furthermore, WF's own discovery responses contradict its belated attempt to argue lack of medical necessity: "Accordingly, Plaintiff was fully accommodated *pursuant to his request and the medical documentation provided* to the Accommodation Consultant, Joanne Davis." [Doc. 59-25 at p.19, emphasis added]

      b.      **None of the cases cited by WF support its position.**

In addition to the factual discrepancies, the cases WF cites do not support its position. For instance, *Kande v. Dimensions Health Corp.,* 2020 U.S. Dist. LEXIS 225930, 2020 WL 7054771, **8 (D. Md. Dec. 2, 2020) the court found that, "[t]aken in the light most favorable to Plaintiff, Dr. Rogers' testimony and the documentation he provided at the time sufficiently establishes that it was necessary for Plaintiff to rest at home and limit her activity due to her disability, and not a matter of mere preference." Here, the documentation from Billesdon's treating physicians is even more compelling. [Doc. No. 59-3, 59-26, and Ex. L, WF-0004748-49]

*Stern v. Univ. of Osteopathic Med. Hth. Sch.*, 220 F.3d 906, 908-909 (8th Cir. 2000) does not stand for the proposition WF claims. In *Stern*, the plaintiff, a student with dyslexia, sought test-taking accommodations that the university rejected and offered a different accommodation.

In support of its summary judgment motion, the university filed a declaration from a clinical psychologist, who attested that any difficulties in taking the test would be accommodated by the university's suggested accommodation. *Id*. at 908. The Eight Circuit explained: "We believe that *in response to the affidavit of the expert witness*, Mr. Stern was obliged to present expert evidence that the testing scheme that he requested was actually related to his disability and, furthermore, provided a benefit not available from the accommodations that the medical school did offer to him." *Id.* at 909. WF has not submitted a declaration by a medical expert opining that Billesdon's requested accommodation is not related to his disability. In fact, the only evidence before the Court is the opposite - the requested accommodation *was* medically necessary.

*Roop v. Desousa*, 660 F.Supp.3d 477, 485 (E.D. Va.2023) does not support WF's position and actually supports Plaintiff's position to the extent it can be used at all. *Roop* is a personal injury case where the plaintiff failed to disclose an expert to opine on the causal connection between her injury and the accident. Although her treating physician was excluded from testifying on causation, the court actually allowed part of her damages to go to the jury without expert testimony on causation. *Id*. at *31-32. WF cites no case law supporting its contention that plaintiffs in ADA actions must have an expert to testify on whether an accommodation is medically necessary.

WF next argues it is not bound by Billesdon's choice of accommodation. However, Davis, *who is WF*, also chose work-from-home as the most reasonable accommodation for Billesdon and fought hard for it against Iannuzzi for it. In addition, the only alternative accommodation Iannuzzi suggested - having multiple seats in the office – was deemed ineffective by two of Billesdon's medical providers. "Reasonable accommodation may take many forms, but it must be effective." *Noll v. International Business Machines Corp.,* 787 F.3d

10

Case 3:23-cv-00160-FDW-SCR   Document 62   Filed 02/02/24   Page 10 of 20

89, 94 (2d Cir. 2015).

**B.  WF is not entitled to judgment on Billesdon's termination-as-discrimination claim.**

**1.  Billesdon can establish a prima facie case of disability discrimination.**

WF uses the elements found in *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015), and argues only that Billesdon was terminated because of his disability. Although Plaintiff can meet these elements, they are not the correct elements for RIF-related discrimination.

WF's sole argument on causation under its incorrect standard is that it is "illogical" that Doyle and/or Iannuzzi would suddenly decide to discriminate against Billesdon when they have known him for many years, were aware of his medical condition and socialized with him. Not surprisingly, WF cites no case law supporting this novel theory for avoiding liability for disability discrimination. Furthermore, the evidence shows exactly why and when Doyle and Iannuzzi "suddenly" decided to discriminate against Billesdon - when he asked for an accommodation for a disability they did not feel was necessary. And they clearly did not like that Billesdon bypassed them and went to their Accommodations Consultant who then pressured them to allow Billesdon to work from home, even telling them it was advised by in-house counsel. Statements evincing hostility to an employee's disability accommodation permit a reasonable inference of a causal connection. *Kenny v. Yellen,* 2022 U.S. Dist. LEXIS 236724, *26 (D.S.C., Dec. 8, 2022).

In addition, temporal proximity can be used to make out a prima facie case of discrimination. *Hampton v. Charlotte-Mecklenburg Bd. of Educ*. 2021 U.S. Dist. LEXIS 108595, *29 (W.D.N.C., June 9, 2021). Here, WF's timing was impeccable. On *the very day* Billesdon's health care provider said that he could not be accommodated in-office, Iannuzzi selected

11
Case 3:23-cv-00160-FDW-SCR   Document 62   Filed 02/02/24   Page 11 of 20

Billesdon for termination through a sham RIF, less than six weeks after his accommodation request was initially communicated to Iannuzzi.

### 2. The RIF was pretextual.

As an initial matter, WF uses the wrong standard for the evidence needed to establish pretext, arguing that Billesdon must make two showings – (1) that WF's reason is false; and (2) that discrimination was the real reason, citing the very outdated case of *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 3770378 (4th Cir. 1995). In so doing, WF attempts to revive the long-rejected "pretext-plus standard." However, after *Reeves v. Sanderson Plumbing Prods*, 530 U.S. 133 (2000), plaintiffs who make out a prima facie case need only produce sufficient evidence of the falsity of the employer's proffered reason for the adverse employment action. *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726-27 (4th Cir. 2019).

As such, to survive summary judgment, Billesdon need only demonstrate that WF's explanation is mere pretext because he has already made out his prima facie case. "To make this demonstration, the employee must show that as between the plaintiff's [protected status] and the defendant's explanation, [the protected status] was the more likely reason for the dismissal, or that the employer's proffered explanation is simply unworthy of credence." *Tuck v. Henkel Corp.*, 973 F.2d 371, 374-75 (4th Cir. 1992). "The focus of . . . [the] inquiry is whether the employer's stated reason was *honest*, not whether it was accurate, wise, or well-considered." *Anderson v. Ziehm Imaging, Inc.,* 2011 WL 1374794, at *5 (D.S.C. Apr. 12, 2011), emphasis added. Pretext can be found even within the context of a legitimate reduction in force. *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 340-341 (4th Cir. 2002): *Eckhardt v. Bank of America, N.A.*, 2008 WL 5100843, at *16 (W.D.N.C. Nov. 26, 2008) (Although a RIF can be a legitimate, non-discriminatory business reason for a termination, it cannot be used as a means to

discriminate.)

      a.    **Direct evidence of pretext**

Although discriminatory comments may not constitute direct evidence of discrimination, they can be considered as direct evidence of pretext. *Johnson v. City of Charlotte* 229 F.Supp.2d 488, 498 (W.D.N.C., Oct. 2, 2002) citing *Gairola v. Commonwealth of Virginia*, 753 F.2d 1281 (4th Cir. 1985); see also, *Wallace v. DTG Operations, Inc.*, 563 F.3d 357 (8th Cir. 2009) (decisionmaker expressed anger at plaintiff's mode of reporting sexual harassment, even though she followed recommended method); *Bell v. Prefix, Inc.*, 321 Fed.Appx. 423, 430 (6th Cir., April 2, 2009) (reasonable jury could conclude that employer RIFed plaintiff because of his use of FMLA leave based in part on the decision maker's bad reaction to the leave and saying it was bad for the company). Here, Iannuzzi's comments during the purported interactive process, expressing anger/frustration that Billesdon did not come to him directly, give rise to an inference of discrimination suggesting the RIF shortly thereafter, in which Iannuzzi was essentially the *sole* person who rated Billesdon last, as pretextual. Furthermore, despite being embroiled in fighting against Billesdon's accommodation request at the time he added him to the RIF, neither Iannuzzi, nor anyone at Wells Fargo checked the box on the RIFF indicating that he has a disability.

      b.    **Indirect evidence of pretext**

Although there is no single way to show pretext in a RIF case, a plaintiff can demonstrate pretext in three principal ways: (1) his termination was not in accord with the RIF; (2) the RIF criteria were deliberately falsified or manipulated in order to justify the termination; or (3) the RIF in general was a sham or pretextual. *Pippin v. Burlington Resources Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006). There is proof of all three here, as well as other indicia of pretext.

### i. The Revised RIF itself was pretextual.

- **WF did not follow its own RIF procedures and the documentation is lacking and/or incorrect.**

Failure to follow its own written RIF policy can support the inference that an employer was determined to layoff employees in a protected category, rather than its stated reason. See, *Skalka v. Fernald Enviro. Restoration Mgmt. Co.*, 178 F.3d 414, 422 (6th Cir. 1999); *Tyler v. Union Oil Co.*, 304 F.3d 379, 396-97 (5th Cir. 2002) ("An employer's conscious, unexplained departure from its usual policies and procedures when conducting a RIF may in appropriate circumstances support an inference of age discrimination if the plaintiff establishes some nexus between employment actions and the plaintiff's age."). The Fourth Circuit has explained in *Stiles v. General Elec. Co.,* 1993 U.S. App. LEXIS 2870 (unpublished) that evidence that employer failed to follow established procedures helps show pretext and "forfeit[s] a possible shield to [plaintiff's claims by failing to follow its own procedures." *Id.*

Here there is ample evidence from which a reasonable jury could find that WF did not follow its own procedures. The narrative in WF's Fact Statement is contradicted by the deposition testimony of Iannuzzi and Doyle, as well as every other deponent and nearly all the contemporaneous documents. Instead of being part of a legitimate RIF, Billesdon was added to an existing RIF Business Case that was already fully approved, so his Business Case did not go through all the proper channels. The Revised RIFF had two job codes, which is improper and it was pushed through in record speed. It was even pushed through faster than Iannuzzi was advised contemporaneously that it could be done. A process that should have take 4 - 6 months, took 10 days, because WF departed from its own policies and procedures.

In addition, in *Bateman v. American Airlines, Inc.*, 614 F.Supp.2d 660 (E.D. Va. Mar. 9, 2009) found it "disturbing" that "[the employer] has provided no written documentation that the

14

RIF was a pre-planned, deliberate action." *Id*. at 677. The court emphasized that it "casts a wary eye on undocumented RIFs." *Id*., citation omitted. Here, the documentation is likewise lacking and/or incorrect. WF relies mostly on the narrative of Doyle and Iannuzzi, but the timeline and documents supporting that timeline tell an entirely different story.

Lack of training and guidance is also evidence of pretext. *Kirby v. Payless Shoesource, Inc.*, 2008 WL 4381917, *36 (D. Mass. Sep. 25, 2008) (that key decision makers received no guidance regarding criteria to be used in the elimination process is evidence of pretext.) Here, it was Iannuzzi's first RIF and the evidence shows he completely skipped the training that was required before he could rate Billesdon's group and he had already selected Billesdon before being reminded of the required training.

### ii. The Revised RIF specifically targeted Billesdon.

- **The Revised RIF candidate pool was manipulated.**

When a RIF includes only one employee—and the one employee is a member of a protected class—this is some evidence of pretext. *Aludo v. Denver Area Council*, 2008 WL 3480079, at *5 (D. Colo. Aug. 8, 2008). See also, *Moody v. Pepsi-Cola Metropolitan Bottling Co.*, Inc., 915 F.2d 201, 209 (6th Cir. 1990); *Hillebrand v. M-Tron Indus., Inc.,* 827 F.2d 363, 366—68 (8th Cir. 1987). Here, there is considerable evidence from which a reasonable jury could find it pretextual that the RIF pool itself was a manipulated farce to make it look like it contained more candidates than it actually did. Billesdon was added to an existing RIF to look like there was a bigger pool. Templeton was never going to be terminated in that RIFF regardless of his rating.

- **The Revised RIF criteria were subjective and manipulated.**

Although a plaintiff cannot argue that the employer showed bad judgment in deciding

who to terminate with the RIF criteria, he can argue that the method used by the employer showed that it was not really trying to decide which employee to terminate using the RIF criteria. See, e.g. *Stenberg v. I.C. System, Inc.*, 2009 WL 1507417, at *7 (D. Minn. May 29, 2009). Where an employer considered only certain subjective aspects of an employee's performance evaluations, and ignored or downplayed other objective qualifications it was evidence of pretext. *Aludo, supra.* Similarly, where the plaintiff had a 25-year history of satisfactory performance but company could only point to a wholly subjective termination decision, it was evidence of pretext. *Stiles, supra.* Here, there is ample evidence that the RIF criteria were manipulated so Billesdon would be the only candidate terminated. After the initial RIFF was final and approved for FitzHugh, Iannuzzi added compensation as a category, ensuring Billesdon would be eliminated. He also did not check the box for Billesdon's performance reviews, which were all the highest rating, so he could mark Billesdon down on the same criteria.

### iii. Billesdon's termination is not in accord with the Revised RIF criteria.

A reasonable jury could find pretext where "[t]he scores given Plaintiff by the interviewer in regard to certain criteria were sufficiently unsupportable in light of his experience with the company, which should have been easily ascertainable, that they suggest[ed] an intentional skewing of the score. *Harris v. Blue Cross & Blue Shield of S.C.*, 2006 WL 2827704, at *2 (D.S.C. Sept. 28, 2006); see also, *Eckhardt, supra,* at *17 (finding pretext where disabled employee selected for RIF demonstrated lesser performing unprotected employees were retained). Here, there is ample evidence that the criteria WF claims it used are entirely unsupported and unsupportable. Billesdon's performance reviews garnered him the highest bonuses and used the same criteria Iannuzzi claimed he was lacking in. Iannuzzi offers no support for his false conclusions about Billesdon's product knowledge, collaboration and

leadership.

> v.  **The temporal proximity to Billesdon's accommodation request and the decision makers abject resistance to it also suggests pretext.**

Where an "employee's position was selected for inclusion in the RIF only a month after he made his last request for disability accommodation" it could show pretext. *DuBerry v. District of Columbia,* 582 F.Supp.2d 27, 37 (D.D.C. 2008); see also, *Wallace v. DTG Operations, Inc.*, 563 F.3d 357 (8th Cir. 2009) (employer made decision to terminate only 15 days after plaintiff's protected conduct, and on the same day decisionmaker consulted with the supervisor accused of sexual harassment); *Martin v. AT&T Corp.*, 331 F.Supp.2d 1274 (D. Colo. 2004) (immediately after plaintiff requested telecommuting as an accommodation, he was subject to increased scrutiny, downgraded on his evaluation, and selected for RIF); *Price v. Washington Hosp. Center*, 321 F. Supp. 2d 38, 49 (D.D.C. 2004) (employer designated plaintiff for RIF four days after she disclosed need for hemodialysis).

Here, Billesdon was selected by Iannuzzi *on the very day* Iannuzzi learned that his preferred accommodation for Billesdon was deemed ineffective by Billesdon's doctor and six weeks after he first learned Billesdon was requesting an accommodation.

**C.  WF is not entitled to summary judgment on the ADEA claims.**

**1.  Billesdon has ample evidence of age discrimination.**

WF challenges only the third element, arguing that Billesdon cannot make out a prima facie case of age discrimination because there is purportedly "no evidence" that age had anything to do with Billesdon's inclusion in the RIF. See, *Tickles v. Johnson*, 805 F. App'x 204, 207 (4th Cir. 2020). However, Billesdon testified for 18 pages about the circumstantial evidence of age discrimination. [Ex. B at 171-189].

WF next argues that statements made about other employees is inadmissible character evidence under FRE 404. This is not so. Under Rule 404(b), a party may introduce such evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Here, the evidence is admissible to show motive, intent, and/or plan. Indeed, evidence of an employer's conduct towards other employees is relevant and admissible to show that an employer's proffered justification is pretext. See, e.g., *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 194 n.8 (3d Cir. 2000) ("evidence of a defendant's prior discriminatory treatment of a plaintiff *or other employees* is relevant and admissible ... to establish whether a defendant's employment action against an employee was motivated by invidious discrimination").

WF next argues that "most" of the comments were attributable to Farrell, who was not a decisionmaker. First, WF admits that some of the statements were made by Doyle, a decisionmaker, which is enough to defeat summary judgment. Second, Billesdon testified at length as to the extensive comments by Doyle and that she actually "ran with" Farrell's established age discrimination policy. Third, under the "cat's paw" doctrine, WF is liable for discrimination by non-decisionmakers. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004).

2. **Billesdon has ample evidence of age retaliation.**

WF argues that Billesdon has neither alleged nor produced evidence that he engaged in protected activity under the ADEA, but Billesdon testified that he opposed the age discrimination comments/policy by WF many times. [Ex. B at 188:21-189:17.]

D. **WF is not entitled to summary judgment on the wrongful discharge claim.**

Billesdon's North Carolina common law claim for wrongful discharge in violation of

public policy is derivative of his ADA and ADEA claims and therefore fails for the same reason as the federal claims. WF does not challenge the wrongful discharge claim on any other basis. As such, since both federal claims independently survive summary judgment, the state law claims based on each of these federal claims survive as well.

**E.      WF is not entitled to summary judgment on punitive damages.**

Despite setting forth the standards for punitive and liquidated damages, WF only analyzed the "malice" prong, completely ignoring the reckless indifference and reckless disregard standard. Even its malice analysis is weak. To wit, WF claims it is not liable under the malice prong because Billesdon, Doyle, and Iannuzzi were friends, and there is no evidence they harbored any ill will toward Billesdon. However, WF cannot obtain summary judgment on the punitive and liquidated facts unless it shows, by undisputed facts, that it did not act with reckless indifference or reckless disregard in failing to accommodate Billesdon and/or terminating him based on disability and/or age. The evidence above demonstrates that Billesdon can establish recklessness, if not malice.

**V.      CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny WF's motion for summary judgment in its entirety.

Respectfully submitted this 2nd day of February 2024.

*/s/ L. Michelle Gessner*

L. Michelle Gessner, NCSB#26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*

## CERTIFICATE OF LENGTH

I certify that this brief was prepared using Microsoft Word, which reports that it contains a total of 5992 words, inclusive of the caption, headings, signature and this certificate.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 2, 2024.	*/s/ L. Michelle Gessner*
L. Michelle Gessner, NCSB#26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*