## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## Civil Action No.:  3:23-cv-160

| | |
|---|---|
| **CHRISTOPHER JOHN BILLESDON**,<br><br>Plaintiff,<br><br>v.<br><br>**WELLS FARGO SECURITIES, LLC,**<br><br>Defendant. | **PLAINTIFF'S RESPONSE IN OPPOSITION OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, FOR A NEW TRIAL AND TO ALTER OR AMEND THE JUDGMENT** |

## I.    BOTTOM LINE UP FRONT

Defendant Wells Fargo Securities, LLC ("WF") has filed four post-trial motions in one seeking to undo, or at least drastically reduce, the $22.1 million verdict rendered in favor of Plaintiff Christopher Billesdon ("Billesdon") following a five-day jury trial. None of the motions have any merit.

- This Court can summarily deny WF's Motion for Judgment as a Matter of Law and Motion for New Trial because WF combines the analyses of these two motions, despite the vastly different standards of review, giving this Court essentially no demonstrated legal basis for ruling on either motion. WF makes no effort to analyze the evidence under the applicable legal standard for either motion.

- WF's legal challenge to the ADA failure-to-accommodate claim is based on a false factual narrative and inapplicable case law.

- WF's legal challenge to the ADA disability claim is based on an erroneous articulation of "but-for" causation and misrepresented case law.

- WF's evidentiary challenge to the ADA retaliation claim erroneously assumes the jury found WF's witnesses credible, when it clearly did not.

- WF consented to a jury trial on the ADA retaliation claim and waived its right to belatedly insist on a bench trial.

- WF fails to show that any of the damages awards should be reduced or retried.

Accordingly, the Court should exercise its discretion in favor of leaving the jury verdict intact, both as to liability on each claim and as to each item of damages awarded.

## II. OVERVIEW OF EVIDENCE AT TRIAL[1]

The documentary evidence introduced in this case contained enough circumstantial evidence for a jury to find in Billesdon's favor on both types of disability discrimination - failure to accommodate and wrongful discharge - as well as retaliation for seeking an accommodation for his disability. On the one hand, the jury received evidence of the contemporaneous notes of WF's ADA Consultant, Joanne Davis, which meticulously documented all oral and written communications on each step of Billesdon's request for a reasonable accommodation. These notes reveal that Billesdon's managers - Templeton, Iannuzzi, and Doyle - clearly had no intention of allowing Billesdon to work from home as a reasonable accommodation, despite the recommendation of both Davis and in-house counsel. [Trial Exhibit P-1]

On the other hand, the jury received evidence of these very same individuals - Iannuzzi and Doyle – simultaneously adding Billesdon's name to an already approved and finalized reduction in force once they realized there was no way around allowing him to work from home for at least a three-month trial period as recommended by in-house counsel and on the same day

---

[1] Billesdon's presentation of the evidence at trial is based on the documentary evidence, review of the draft transcript and trial counsel's recollection. Although WF's motion cites to the draft transcript of the trial proceedings, providing "placeholders" instead of page numbers, this process seems to contradict the express statement on the face of the draft transcript that it may not be relied on for any official purposes or for any verbatim citation. As such, this Response does not cite to the draft transcript.

they learned Billesdon's physician concluded that no in-office accommodation would be effective. The business case itself and the emails related to it, reveal on their face that WF did not follow its own procedures when it terminated Billesdon using a purported reduction in force. [Trial Exhibits P-9, P-10, P-12, P-14, P-15, P-16, P-19, P-27-P-32] The jury also saw evidence that David Robinette - the person who was supposed to make sure WF followed the proper procedures for a reduction in force - emailed Iannuzzi and said "There we go!" when they got the final approval that they would be able to terminate Billesdon in February 2022, *before* employees would be required to return to office. [Trial Exhibit P-31]

Given the damaging paper trail on both the accommodation track and the reduction-in-force track, even if credibility was neutral, there was enough for a jury to conclude that WF failed to accommodate Billesdon and then terminated him based on his disability, his request for an accommodation, or both. But credibility was far from neutral in this case. Both in its overall defensive strategy and in the individual testimony of its witnesses, WF's presentation of the "facts" was simply not believable. Indeed, WF has no one to blame but itself for the jury's $22.1 million verdict in Billesdon's favor. From the inception of this case, WF made a strategic choice to ignore its own ADA Consultant's notes and run with a narrative that lacked even a scintilla of credibility. No reasonable jury was ever going to believe that Billesdon was seeking to work-from-home while he was already working from home and thus WF "accommodated him at all times." Whoever made the decision to pursue that defensive theory set the case up for failure for WF. Further, at trial, that fate was sealed when WF made the incredibly distasteful decision to attack Billesdon's credibility by belittling his disability, questioning his life choices as a disabled person, and suggesting he was faking his need for an accommodation.

Not surprisingly, WF's blame-the-victim strategy backfired, as it tends to do in such

cases. Instead of Billesdon's credibility taking a hit, WF's did. Making matters worse, WF's witnesses were dodgy in their responses to simple questions about the accommodation request process and the RIF process, causing them to be repeatedly impeached by Davis's notes and their own RIF documents. In the end, the circumstantial evidence of discriminatory animus lurking in the documentary evidence came to life during trial, connecting the dots for the jury. From there, it was just a short hop to disbelieving anything that any WF witness said about the decision to terminate Billesdon as being "completely separate" from his disability and/or request for accommodation.

## III. WELLS FARGO IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A. Standard of review for Renewed Motion for Judgment as a Matter of Law

When a court "does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). If the jury ultimately decides an issue against the party that sought judgment as a matter of law, that party may file a renewed motion for judgment as a matter of law. *Id.* A court may grant such motion "if a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). "[T]he evidence and all reasonable inferences from it are assessed in the light most favorable to the [non-moving] party, and the credibility of all evidence favoring the non-moving party is assumed." *Crinkley v. Holiday Inns, Inc.,* 844 F.2d 156, 160 (4th Cir. 1988); *Konkel v. Bob Evans Farms, Inc.,* 165 F.3d 275, 279 (4th Cir. 1999). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). The

jury verdict must stand "if there is evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." *Lovell v. BBNT Solutions, LLC*, 295 F.Supp.2d 611, 617 (4th Cir. 2003).

**B.**    **Wells Fargo has not even attempted to meet its burden for JMOL.**

Although WF recognizes the standard for a renewed motion for judgment as a matter of law under Rule 50(b), it does not even attempt to meet that standard anywhere in its brief. As to each of the four claims on which the jury rendered a verdict in Billesdon's favor, WF references various documentary and testimonial evidence, but it never once acknowledges that the Court must view that evidence in the light most favorable to Billesdon and draw every legitimate inference from it in his favor. Instead, WF has chosen to consider only select evidence, and in the light most favorable to itself. WF references evidence it claims is in its favor, but never once acknowledges that the Court must disregard that evidence unless the jury was required to believe it. Never once does WF acknowledge that this Court must assume that testimony in favor of Billesdon is credible, unless it is totally incredible on its face and that it must ignore the substantive weight of any evidence supporting WF. As the non-moving party, Billesdon is entitled to the benefit of "every legitimate inference" in his favor. *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1419 (4th Cir.), *cert. denied*, 502 U.S. 963 (1991). This is especially true where determinations of motive and causation are critical. *Taylor v. Home Ins. Co.*, 777 F.2d 849, 854 (4th Cir. 1985), *cert. denied*, 476 U.S. 1142 (1986).

This Court can deny the motion for judgment as a matter of law straight away because WF did not meet its burden under the applicable standard. Moreover, as will be shown below, using the standard more favorable to WF, there was ample evidence adduced at trial from which a jury could return a verdict in favor of Billesdon on each claim, as it did.

**IV.    WELLS FARGO IS NOT ENTITLED TO A NEW TRIAL**

**A.    Standard of Review for Motion for a New Trial**

A motion for a new trial made under Federal Rule of Civil Procedure 59(a) is "governed by a different standard" than a Rule 50(b) motion. *Cline*, 144 F.3d at 301. Rule 59(a) permits a district court to set aside the verdict and grant a new trial where: (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. *Doe v. Fairfax Cnty. Sch. Bd*., 1 F.4th 257, 268 (4th Cir. 2021) (citations and quotations omitted), cert. denied, 143 S. Ct. 442 (2022).

"The legal standard for granting a new trial under Rule 59(a) calls for deference to jury determinations while affording discretion to the trial judge to order a new trial in the event of manifest injustice." *Brunt-Piehler v. Absolute Software, Inc*., 2024 U.S. Dist. LEXIS 143708, *7 (W.D.N.Y., Aug. 13, 2024). Although the trial judge is free to weigh the evidence for herself when considering a Rule 59(a) motion, she should defer to the jury's credibility determinations. *United States v. Landau*, 155 F.3d 93, 104-05 (2d Cir. 1998); *ING Glob. v. United Parcel Serv. Oasis Supply Corp*., 757 F.3d 92, 97 (2d Cir. 2014). Indeed, "where the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992); *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) ("trial judges must exercise their ability to weigh credibility with caution and restraint, as a judge 'should rarely disturb a jury's evaluation'" on a Rule 59 motion).

**B.    The jury's verdict on the ADA failure-to-accommodate claim is not against the clear weight of the evidence and should not be disturbed.**

Persisting in its word games, WF argues that the evidence is "undisputed that Billesdon

actually received the accommodation he requested for the remainder of his period of employment: working 100% remotely from home." [Doc. No. 118 at p. 4] This argument remains as preposterous today as it was the first time WF raised it on summary judgment. [Doc. No. 56 at p.11] Billesdon never requested that WF allow him to work-from-home while it was already allowing him to work-from-home. That is just silly.

Making matters worse, WF misrepresents the documentary evidence when it claims that Billesdon's formal accommodation request only sought merely to "continue to use his learned behavioral modification of working from home." On page 2 of that formal request, prior to the quoted section, it states: "Wells Fargo is *starting to require in-office presence*, and this is now a conflict for Mr. Billesdon's disability mitigation. Mr. Billesdon *being forced to return to in-office presence* would interfere with learned behavioral modifications (mitigators) for his disabilities. It is imperative that his right to continue to use his learned behavioral modifications be kept intact." [Doc. No. 118-3 at p. 2, emphasis added] Clearly, the formal request sought an accommodation for the time period *after* Billesdon would be required to return to work, not before. Any suggestion otherwise is disingenuous. And desperate.

WF next misrepresents the witness testimony when it claims that "[e]very witness to testify on the substance of Plaintiff's request understood it that way, including Plaintiff." First, WF references the testimony of Davis, Billesdon and Doyle, which is not "every witness." Second, Davis testified at length that Billesdon was not asking to work from home while he was already working from home; his request to work from home was directly tied to WF's return to office mandate. Davis's notes make this fact abundantly clear. In fact, the documentary evidence shows that WF eventually closed Billesdon's accommodation request until such time as WF set a definite return to work date and told him to open another accommodation request when he was

required to return to the office - all the while knowing he was set to be terminated and would never be returning to the office. Based on their testimony and Davis's notes, there can be no doubt that Templeton, Iannuzzi, and Doyle understood his request this way as well. Billesdon's testimony and his interrogatory responses, which were entered into evidence by WF, make it clear that his accommodation request was tied to the return to office timeframe, not before. [Trial Exhibit, D-86]

Next, the only reason WF makes this nonsensical argument is to try to force its twisted view of the facts into the holdings of two cases it relies on to argue it did not fail to accommodate Billesdon. Notably, these legal arguments have already proven to be unsuccessful in WF's failed summary judgment motion. First, WF argues an employer satisfies its duty to accommodate disabled employees so long as they receive their requested accommodation, regardless of whether non-disabled employees also receive that accommodation, citing *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 169 (4th Cir. 2024). This is simply a strawman argument that WF sets up just to knock down. Billesdon has never argued that WF failed to accommodate him because it was allowing others to work from home at the same time. Indeed, as noted above, Billesdon was not requesting to work from home while everyone else was; he was requesting to continue to work from home after everyone was required to return to the office. Furthermore, *Tartaro-McGowan* does not include this "clear" statement of the law that WF claims it does. Instead, the Fourth Circuit merely mentions an argument in passing that the plaintiff's attorney abandoned during oral argument. *Id*. at 169.

Second, WF argues that the speculative possibility of being denied an accommodation in the future is not enough to sustain a failure-to-accommodate claim, citing *Alston v. Holy Cross Health, Inc.*, 2023 WL 2743332, at *10 (D. Md. Mar. 31, 2023). Once again, WF sets up a

strawman argument, just to knock it down. In *Alston*, the only reason the district court mentioned a future accommodation is because the plaintiff never notified his new supervisors about his disability and never sought an accommodation in the present. *Alston* at *30. In any event, WF's argument under *Alston* that Billesdon was seeking an accommodation in the future directly conflicts with its argument under *Tartaro* that Billesdon was already being accommodated.

Perhaps as an afterthought, WF now relies on an Eleventh Circuit case which it claims rejected Billesdon's "exact argument" – *Batson v. Salvation Army*, 897 F.3d 1320 (11th Cir. 2018). Aside from not being binding, *Batson* is factually distinguishable. In *Batson* the plaintiff went out on FMLA leave right after her request for an accommodation was denied. When the plaintiff returned from leave after six weeks, she was terminated. The Eleventh Circuit noted that "[t]he problem for Batson is that she has offered no evidence that before her FMLA leave and her termination she needed either of the accommodations she previously had requested generally." Here, by contrast, Billesdon introduced ample evidence that he needed the accommodation he requested. Further, if *Batson* was so perfectly on point, WF should have included it in the jury instructions. Since it did not do so, any potential error was invited and any challenge waived. In any event, WF's argument under *Batson* - that it never had the opportunity to specifically deny Billesdon's request for an accommodation - conflicts with its position under *Tartaro-McGowan* - that it was already accommodating Billesdon.

In any event, Davis's notes make it clear that Iannuzzi and Templeton said "no" to Billesdon's request to work from home indefinitely. They said "no" to Davis's suggestion that they try it for 6 months. They said "no" to Davis's suggestion, on advice of counsel, that they try it for 3 months. They may have secretly been working on the alternative of "two seats" but the evidence at trial showed that this possibility was never communicated to Billesdon. Incredibly,

WF did not even take the pictures or do the measurements they tried to convince the jury proved their efforts to accommodate, until just weeks before trial! The jury had ample evidence to conclude that WF denied the only reasonable accommodation that was on the table.

Lastly, WF ignores the other ways in which an employer can be liable for failure to accommodate, such as unreasonable delay (*Farquhar v. McCarthy*, 814 Fed. Appx. 785, 788 (4th Cir. 2020), a failure to engage in the interactive process that resulted in the failure to identify an appropriate accommodation (*Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (unpublished)), and even termination in lieu of accommodation. (*Cable v. Starbucks Corp.*, 2023 U.S. Dist. LEXIS 50784, *25 (CD Cal., March 24, 2023). The jury had ample evidence to find a failure to accommodate on any one of these bases as well.

**C.    The jury's verdict on the ADA disability discharge claim is not against the clear weight of the evidence and should not be disturbed.**

WF begins its analysis with blatant misrepresentations of the two cases it cites - *Kelly v. Town of Abingdon*, 90 F.4th 158, 169 (4th Cir. 2024) and *Franchina v. City of Providence*, 881 F.3d 32, 53 (1st Cir. 2018). For instance, WF cites *Kelly* for the proposition that "[t]he essential element of this claim required Plaintiff to establish but-for causation—i.e., *if Plaintiff had not been disabled but everything else remained the same, the discharge would not have occurred*." [Doc. No. 118 at p. 6 (emphasis added)] The italicized portion of WF's assertion does not appear anywhere in *Kelly*. In fact, the Fourth Circuit in *Kelly* made a correct statement of but-for causation – "To raise a reasonable inference of disability discrimination in a wrongful discharge case, an employee must allege that his disability was a "but-for" cause of his termination." *Kelly, supra*, at 169, citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235-36 (4th Cir. 2016) (emphasis added); see also, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218 (4th Cir. 2016) ("[Plaintiff's] burden is only to show that the protected activity was a but-for cause of

her termination, not that it was the sole cause."). As WF was made well aware during the jury charge conference, *Gentry* holds that "disability need not be the 'only or sole cause' of [the plaintiff's] termination." *Gentry, supra*, 816 F.3d 228, 236 & n5. To argue that Billesdon must prove that "had he not been disabled but everything else remained the same" is the same as requiring him to prove discrimination was "the" but-for cause, rather than "a" but-for cause. In fact, the next case WF misrepresents spells this out more clearly.

WF cites *Franchina* for the proposition that "but-for causation requires showing that 'all else being equal,' discrimination would not have occurred without protected trait." Nothing could be further from the truth. The First Circuit in *Franchina* actually held that the "all else being equal" *is not the law*. The full quote from *Franchina* is as follows:

> The City's position conflicts also with Title VII's text and jurisprudence. Requiring a plaintiff to point to a comparator of the opposite gender implies the inquiry is that of 'but-for' causation. That is to say, the City's approach requires Franchina to make a showing that, all else being equal (the "plus" factors being the same), the discrimination would not have occurred but for her gender. *Title VII requires no such proof.* The text bars discrimination when sex is 'a motivating factor,' not 'the motivating factor.' 42 U.S.C. § 2000e-2(m).

 *Franchina, supra,* at 53 (emphasis added). Once again, arguing that "all else being equal" discrimination would not have occurred is the same as arguing that discrimination must be "*the*" but-for cause." Indeed, that is why the First Circuit in *Franchina* rejected such language and immediately pointed out the difference between "a" motivating factor and "the" motivating factor.

Since WF is wrong on the law, its subsequent attempt to analyze the evidence under the made-up causation standard is equally unavailing. It appears WF is attempting to argue that Billesdon's disability could not be "the" but-for cause of his termination because, in fact, his request for an accommodation was "the" but-for cause. Of course, under the correct articulation

of the law, his disability was a but-for cause of his termination and his request for accommodation was also a but-for cause. WF's complete butchering of but-for causation is perhaps most apparent in the following statement: "And here, the jury could not reasonably have found that Plaintiff would have kept his job if he was not disabled yet still had requested to work from home 100% of the time for some reason other than disability." [Doc. No. 118 at p. 8] Of course, the jury was not tasked with making any such finding because Billesdon was not required to prove such gibberish as an element of his disability discrimination claim.

WF next cites *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) for the proposition that "[W]ithout any direct evidence of disability discrimination, the 'lengthy time lapse' between the relevant decisionmakers' knowledge of Plaintiff's disability and his termination 'negates any inference that a causal connection exists between the two.'" [Doc. No. 118 at p. 7] Incredibly, this is *yet another* blatantly misrepresented case cite. *Dowe* is a retaliation case, not a discrimination case. The full quote is: "A lengthy time lapse between the employer *becoming aware of the protected activity* and the alleged adverse employment action, as was the case here, negates any inference that a causal connection exists between the two." *Dowe*, *supra,* at 657 (emphasis added). WF broke up the quote and excised key language to hide the fact that the Fourth Circuit was discussing retaliation, not discrimination. Not surprisingly, WF cites no applicable case law, holding that an employer can avoid liability for disability discrimination based on the passage of time alone. And, in any case, the unrefuted evidence at trial was that Billesdon's disability *did* change over time, as he aged. Further, the mitigation measures that triggered the need for accommodation were not put in place until 2017. Prior to that, Billesdon was simply sacrificing his health in order to excel at his job. Every piece of evidence WF cites about its supposed knowledge of Billesdon's disability is long

before 2017, when the evidence clearly provided to the jury supported the decline of his health and his medical need to take additional measures to empty his paralyzed bladder and colon.

Lastly, WF chose not to address its supposed legitimate business reason as it pertains to the discriminatory discharge claim and this argument is, thus, waived.

**D.      The jury's verdict on the North Carolina wrongful discharge claim is not against the clear weight of the evidence and should not be disturbed.**

WF's challenge to the jury verdict on the state law claim is purely derivative. Since WF has failed to show the jury verdict on Billesdon's ADA claims for disability discrimination and failure to accommodate are against the clear weight of the evidence, it likewise fails to show his claim for wrongful discharge in violation of public policy is against the clear weight of the evidence.

**E.      The jury's verdict on the ADA retaliation claim is not against the clear weight of the evidence and should not be disturbed.**

In contrast to its previous challenges to the jury's verdicts on Billesdon's claims for disability discrimination, which are heavily steeped in legal arguments (albeit erroneous ones), WF's challenge to the jury's verdict on Billesdon's claim for ADA retaliation is strictly factual. WF cites only four cases in this section, and all of them were decided at the summary judgment stage, so they are of minimal value in a motion for a new trial.

WF only challenges the jury's finding on the fourth element of Billesdon's ADA retaliation claim - that his request for a disability accommodation was a but-for cause of his termination. WF argues there was insufficient evidence to support the conclusion that its decision to terminate Billesdon was motivated by his request for an accommodation. Rather, WF asserts, the evidence showed he was terminated for a legitimate, nondiscriminatory reason: a reduction in force. However, WF's purported reduction in force was simply not credible. Pretext can be found

even within the context of a "legitimate" reduction in force. *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 340-341 (4th Cir. 2002); *Eckhardt v. Bank of America, N.A.*, 2008 WL 5100843, at *16 (W.D.N.C. 2008).

Typically in a RIF case, a plaintiff can demonstrate pretext in three principal ways: (1) his termination was not in accord with the RIF; (2) the RIF criteria were deliberately falsified or manipulated in order to justify the termination; and/or (3) the RIF in general was a sham or pretextual. *Pippin v. Burlington Resources Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006). There was proof of all three at trial, as well as other indicia of pretext. The face of the RIF documents show that WF did not follow its own policies and procedures for adding an employee to a RIF. See, *Stiles v. General Elec. Co.,* 1993 U.S. App. LEXIS 2870 (4th Cir. 1993) (unpublished) (evidence that employer failed to follow established procedures helps show pretext and "forfeit[s] a possible shield to [plaintiff's claims by failing to follow its own procedures.") The irrefutable paper trail shows that Iannuzzi and Doyle opened a closed RIF that was already fully approved and completed just so they could add Billesdon's name to it. Although they claim they previously contemplated terminating Billesdon as part of a reduction in force, there is not a shred of documentary evidence supporting this testimony. Moreover, the operative inquiry is when the process was finalized, not when it began. See, *Sampson v. Arbour-Fuller Hos*p., 2012 U.S. Dist. LEXIS 158251, *9 (D. Mass. Nov. 2, 2012) ("Plaintiff fares better in raising a different timing question: regardless of when the process began, when was the decision to eliminate plaintiff's position finalized?") As such, the jury had ample evidence to find that Billesdon was not terminated using a bonafide RIF.

In addition, the jury heard evidence of pretext beyond the sham nature of the RIF itself. Contemporaneously with putting Billesdon in the closed RIF, Iannuzzi and Doyle had just

learned that Davis was not giving up on pushing them to reasonably accommodate Billesdon's disability by allowing him to work from home and that she had escalated the issue to legal counsel who advised they at least try it for three months. Within days, they learned from Billesdon's physician that in-office accommodations would not be effective. As such, they had two choices – accommodate Billesdon's work-from-home request or fire him. Such close temporal proximity can give rise to an inference of pretext. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 393-94 (4th Cir. 2001); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994).

Davis's notes also revealed Iannuzzi's and Templeton's animosity toward Billesdon for requesting a work-from-home accommodation. They questioned whether Billesdon had legal representation and seemed annoyed he did not come to them directly. They questioned why he never sought an accommodation before and wanted to know how to push back and deny it. At trial, the animosity toward Billesdon for daring to even request a work-from-home accommodation when he was able to travel was on full display. Evidence of discriminatory animus among individuals with influence over decisionmaking can be sufficient for a reasonable jury to conclude discrimination was a motivating factor. See *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) ("[T]he ultimate question is whether the plaintiff presents evidence of conduct or statements by persons involved in the employer's decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in the employer's decision to fire the plaintiff." (cleaned up) (quotation omitted)).

All told, viewing the evidence in the light most favorable to the jury's verdict, the record reasonably supports a conclusion that Billesdon's request for accommodation was a motivating factor in WF's decision to terminate him, and that WF would not have made the same decision

absent his request for accommodation. Simply put, the jury heard conflicting testimony and found Billesdon's evidence more persuasive. Since resolution of the issue depends on assessment of the credibility of the witnesses, it is more appropriate for the Court to refrain from setting aside the verdict and granting a new trial.

## V. WELLS FARGO IS NOT ENTITLED TO AN AMENDED JUDGMENT

### A. Standard for Motion to Amend the Judgment

Rule 59(e) is intended to allow a district court "to correct its own errors [to] 'spar[e] the parties and the appellate courts the burden of unnecessary appellate proceedings.'" *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Thus, a court may grant a motion under Rule 59(e) to alter or amend a judgment if it finds "that there has been an intervening change of controlling law, that new evidence has become available, or that there is a need to correct a clear error or prevent manifest injustice." *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 411 (4th Cir. 2010). "In general, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Pac. Ins. Co.,* 148 F.3d at 403. WF appears to be proceeding on the "clear error" prong.

### B. It was not clear legal error to proceed with a jury trial on Billesdon's ADA retaliation claim.

WF overstates the holding of *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 657–60 (4th Cir. 2023) when it argues that the Fourth Circuit in *Israelitt* held that "the ADA does not authorize compensatory or punitive damages for retaliation claims, and without those legal damages, there is no jury-trial right for such purely equitable claims." [Doc. No. 118 at p. 18] In *Israelitt*, the district court granted summary judgment on plaintiff's discrimination, wrongful discharge, failure to accommodate, and hostile work environment claims. The *only* claim that survived summary judgment was the ADA retaliation claim and the plaintiff sought a jury trial on that

claim. By contrast to the case at bar, *Israelitt* did not involve legal claims based on the same set of facts to be tried to a jury. *Israelitt* certainly did not hold that ADA retaliation cases can never be tried to a jury. Indeed, "regardless of whether the legal claims are characterized as incidental to the equitable claims; as long as there is a legal claim, the jury trial rights it creates control." *In re Stansbury Poplar Place. Inc.*, 13 F.3d 122,125 (4th Cir. 1993).

In fact, several Circuit Courts have affirmed compensatory and punitive damage awards after jury trials in ADA retaliation cases. See, e.g., *Salitros v. Chrysler Corp.*, 306 F.3d 562 (8th Cir. 2002); *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189 (8th Cir. 2001); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241 (10th Cir. 1999); and *Muller v. Costello*, 187 F.3d 298 (2d Cir. 1999). Indeed, in some cases, the jury trial simultaneously serves as a bench trial for the ADA retaliation claim. *Hillmann v. City of Chicago,* 2017 U.S. Dist. LEXIS 130376, fn 2 (N.D. Ill. Aug. 16, 2017). As such, this Court could simply award the equitable remedies available if it reaches the same conclusion as the jury did on the ADA retaliation claim. With its single case cite to a distinguishable Fourth Circuit case, WF has failed to show that it was "clear legal error" for the ADA retaliation claim to be tried to the jury.

## C.  Wells Fargo consented to a jury trial on the ADA retaliation claim.

A defendant can consent to a jury trial, thus waiving its right to seek a bench trial. See *Rhoads v. F.D.I.C.*, 286 F.Supp.2d 532, 538 (D. Md. 2003), aff'd, 94 F.App'x 187 (4th Cir. 2004). WF consented to a jury trial on the ADA retaliation claim because it could have sought to bifurcate the claim and have it tried to the Court after the jury trial on the legal claims. See, *Fowler v. Westminster Coll. of Salt Lake*, 2012 U.S. Dist. LEXIS 138484, 2012 WL 4378115, at *1 (D. Utah Sept. 25, 2012) (after jury returned a verdict on plaintiff's ADA discrimination claim, the court found for the plaintiff on his ADA retaliation claim and awarded backpay).

WF had years to seek a bench trial on the ADA retaliation claim yet failed to do so. Knowing this, WF argues that it had no "meaningful opportunity" to raise the issue before the claim was sent to jury because Billesdon did not did not propose a jury instruction on the claim initially. This is untrue. WF has been on notice of Billesdon's ADA retaliation claim at least since he filed his Complaint. The general allegations contain an entire separate heading entitled: "***Defendant Illegally Retaliates Against Mr. Billesdon.***" [Doc. No. 1 at p. 6, emphasis in original] Under this heading, there are 15 paragraphs detailing the retaliatory conduct by WF. [Doc. No. 1 at pp. 6-9]  The Complaint also alleges that "Plaintiff satisfied his obligation to exhaust his administrative remedies by timely filing a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on disability *and retaliation*." Count One of the Complaint is entitled: "Violation of Americans with Disabilities Act of 1990, as Amended 42 U.S.C.§ 12101, et seq." and does not specify the various ways in which an employer can violate the ADA but does incorporate the preceding paragraphs.

At the very latest, WF knew Billesdon was proceeding on an ADA retaliation claim when it filed a motion in limine seeking to "prohibit Plaintiff from introducing any evidence, testimony, comment, or argument that his employment was terminated in retaliation for requesting an accommodation for his disability." [Doc. No. 84] Billesdon opposed arguing that the Complaint contained sufficient facts to state an ADA retaliation claim. [Doc. No. 89] The Court ruled on May 7, 2024, during the first pretrial conference, that the Complaint contained sufficient allegations to put WF on notice of an ADA retaliation claim. [Doc. No. 104] Even if it was blissfully unaware of Billesdon's ADA retaliation claim up to that point, WF had *two months* to seek a bench trial on the ADA retaliation claim if it believed it had the right to do so.

Clearly, WF was not aware that it could move for a bench trial on the ADA retaliation claim, or else it would have mentioned it in the motion in limine, instead of just trying to exclude the evidence *from the jury*. If it was aware of the argument it belatedly makes now, WF invited any error. WF cannot roll the dice on a jury trial on the ADA retaliation claim and then cry foul and cast the blame on the Court for "clear error" when it does not like the jury's verdict.

## D.    Wells Fargo cannot raise arguments which could have been raised prior to the issuance of the judgment.

WF acknowledges and agrees that a Rule 59(e) motion seeking to "raise arguments which could have been raised prior to the issuance of the judgment" is not proper. *Pac. Ins. Co., supra,* 148 F.3d at 403. However, it tries to create a new rule stating that it can raise such issue where it "lacked a meaningful opportunity" to raise the issue before judgment. However, this argument is not supported by the case law cited. Nowhere in *Gilliam v. Allen,* 62 F.4th 829, 844–46 (4th Cir. 2023) does the district rule, or even intimate, that new objections can be addressed in a Rule 59(e) motion where a defendant lacked a meaningful opportunity to raise the objection. This is simply not the law. In *Gilliam*, the district court denied a Rule 59(e) motion to reduce a jury verdict to account for a set off for prior settlements with other defendants because it had not been pled as an affirmative defense. In reversing the ruling, the Fourth Circuit held that "any affirmative defense of 'setoff' could not have been pleaded before the facts giving rise to it occurred, i.e., before the settlements were reached." *Id.* at 846. However, here, WF had ample opportunity to seek a bench trial on the known ADA retaliation claim and chose not to do so.

As a last ditch effort, WF cites *Lebron v. Natl. R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995), which deals with preserving federal claims and arguments for Supreme Court review and is thus inapplicable here. There is no "federal claim" implicated by WF's position that the retaliation claim should not go to the jury. This is simply more wordsmithing.

## VI. WELLS FARGO IS NOT ENTITLED TO REMITTITUR OR A NEW TRIAL ON DAMAGES

### A. The jury's award of back pay is not against the clear weight of the evidence.

WF begins its analysis by dropping a critical term in the standard of review. Despite citing case law setting forth the proper standard, WF argues that the jury's award of back pay is against the "weight of the evidence," rather than the "*clear* weight of the evidence." For this reason alone, the Court should deny the motion because WF analyzes back pay under a more lenient, and wholly improper, standard.

WF argues that the jury's award of $6 million in back pay cannot stand because Billeson's "sole evidence" calculated back pay to be only $4,225,558. This is not so. Based on the totality of the evidence adduced at trial, a reasonable jury could have awarded back pay in the amount of $6 million because it is simply not the case that the "sole evidence" calculated back pay at only $4,222,558. Indeed, Dr. Moore testified that his calculations were incredibly conservative and that the damages could be much higher. The jury was free to issue an award that was more generous than Dr. Moore's incredibly conservative calculation. See, e.g., *Larami Corp. v. Amron*, No. , 1995 U.S. Dist. LEXIS 3672, 1995 WL 128022, at *15 (E.D. Pa. Mar. 23, 1995) (upholding a jury verdict greater than an expert's estimated damages because the jury could have reasonably inferred from the testimony that the expert's calculations were conservative). Here, the jury did not have to reasonably infer; Dr. Moore flat out told the jury his calculations were incredibly conservative. Furthermore, there are several explanations for the jury's award of $1.774 million more in back pay than Dr. Moore's incredibly conservative figure.

First, part of Dr. Moore's "incredibly conservative" damages calculation included splitting the compensation for 2024 into back pay and front pay, to account for the fact that judgment would be rendered halfway through 2024. However, the evidence shows that WF pays

the bonuses for the prior year in January of the next year. In this sense, Dr. Moore's chart does not reflect the full bonus that was owed to Billesdon in 2024. Instead of having that bonus split in half, it should have been awarded in full because it was the bonus for 2023, not for 2024. The jury was free to be less conservative than Dr. Moore and award the full bonus as back pay, because it was, in fact, back pay. Indeed, Dr. Moore's report specifically states under Table 2, which the jury viewed, specifically states that Billesdon did not receive his 2022 bonus from WF. [Doc. No. 118-5 at p. 4] As such, the backpay for 2024 should have been $2.4 million, not $1.3 million. The jury likely realized this because it had all the evidence it needed to do so.

Second, Dr. Moore testified that he calculated Billesdon's total compensation at $2.6 million, even though his bonuses trended consistently higher most years. Table 2 of his report shows a difference of $210,000 between 2019 and 2020. It shows a difference of $225,000 between 2020 and 2021. The additional $600,000 could have come from reasonably inferring that Billesdon's trend would have continued as it had been. Third, the jury heard testimony from Iannuzzi and Templeton that WF had a great year in 2023. During closing argument, WF's counsel described WF's numbers in 2023 as "skyrocketing." The jury had WF's 10K filings, which likewise showed WF's increased revenues. This evidence also could account for at least some of the additional back pay the jury awarded. Fourth, Dr. Moore did not give any cost of living adjustment and did not include any deferred compensation that Billesdon would have been earning during 2022, 2023, and 2024. This is further evidence the jury could have considered in awarding more back pay than Dr. Moore's incredibly conservative calculations showed.

Lastly, none of the cases WF cites support its position. In fact, only one of the cases even mentions back pay - *Staudner v. Robinson Aviation, Inc*., 853 F.App'x 806, 811 (4th Cir. 2021). In *Staudner*, the plaintiff was limited to back pay based on his Rule 26 disclosures. During

closing argument, counsel asked for an award of $1 million in front pay. The jury awarded twice as much back pay as the plaintiff's calculation showed. The Fourth Circuit held that the portion of the award that was "unsupported by any evidence" was excessive. In this case, by contrast, it is not the case that the jury's award of back pay is unsupported by *any* evidence.

**B.      The jury's award of front pay is not against the clear weight of the evidence.**

While WF applied the wrong standard for back pay, it did not bother to apply any standard for front pay. Although WF recites some general legal propositions for awarding front pay, it fails to argue, let alone show, that the jury's award of $14 million in front pay was *against the clear weight of the evidence*. WF claims that the $14 million in front pay rests on speculation and is legally foreclosed by Billesdon's subsequent employment history, but this is not the same as showing that the verdict is against the clear weight of the evidence. The Court can deny the motion for this reason alone. In any event, neither argument has any merit.

**1.      The jury's front pay award is not unduly speculative.**

As an initial matter, front pay is inherently speculative. *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018). Front pay awards are allowed to be speculative, but they cannot be *unduly* so. *Deltek, Inc. v. Dep't of Labor*, 649 Fed.Appx. 320, 333 (4th Cir. 2016). WF argues the jury's front pay award is speculative but does not even attempt to show it is *unduly so*. Because of the speculative nature of front pay, the Fourth Circuit has held that it should be "tempered." *Hunter, supra*, 897 F.3d at 562. Here, the jury did its own tempering of the award – reducing it by $14 million and awarding Billesdon only half of what he requested.

Furthermore, to account for the inherently speculative nature of front pay, the Fourth Circuit has developed several non-exclusive factors to consider when awarding front pay. *Hunter*, 201 F.Supp.3d at 758-59. Although WF mentions the existence of these factors, it makes

no effort to identify them or analyze the front pay in this case using the factors. For the sake of being thorough, these factors include the plaintiff's age; the length of plaintiff's employment with the defendant-employer; the likelihood that plaintiff's employment would have continued absent the discrimination; the length of time it would take plaintiff to secure comparable employment using reasonable efforts; plaintiff's work and life expectancy; the typical length of time other employees held the position lost; plaintiff's status as an at-will employee; plaintiff's ability to work, including the ability to work for the defendant-employer; plaintiff's subjective intention to remain in the position; and plaintiff's efforts to mitigate damages. *Id.* Without analyzing the front pay award under these factors, WF cannot show it was unduly speculative.

Additionally, instead of analyzing the *Hunter* factors, WF makes up its own "faulty assumptions" made by Dr. Moore's calculations that supposedly render his calculations defective. For instance, WF claims Dr. Moore should have averaged Billesdons income from 2017 to 2020, but cites no authority for this requirement. Likewise, WF argues that Dr. Moore incorrectly assumed that Billesdon's replacement income would never grow over time. However, once again, WF cites no legal authority requiring Dr. Moore to predict such growth. Next, WF argues that Dr. Moore did not analyze the market demand for Billesdon's occupation, but once again, cites no legal authority requiring Dr. Moore to do so. WF then argues Dr. Moore should have taken into consideration Billesdon's current wealth and his wife's financial situation, but cites no legal authority for such a requirement.

In short, WF cannot refuse to analyze the factors used by the Fourth Circuit, then make up its own unsupported set of factors, and then conclude that the front pay award is not supported by the evidence or calculated with reasonable certainty simply because it does not comport with WF's fabricated factors. Notably, WF chose not to retain a rebuttal expert witness to counter any

of Dr. Moore's assumptions and/or the underlying evidence. Instead, WF seeks to overturn a jury award based solely on counsel's post hoc arguments. Without any countervailing evidence, the jury was free to rely on Dr. Moore's testimony.

**2.      The jury's award of front pay is not legally foreclosed by Billesdon's subsequent employment history.**

WF cites no authority for the proposition that the jury's front pay award is "legally foreclosed" by Billesdon's subsequent employment history because he left a more lucrative role at Brean Capital for a commission-only position at Academy. [Doc. No. 118 at p.1] This is simply not the law. WF does not cite a single case in which front pay was foreclosed because a plaintiff who was wrongfully terminated left a lower-paying commission-based position to take a potentially higher-paying commission-based position.

First, *Dotson v. Pfizer, Inc.,* 558 F.3d 284 (4th Cir. 2009) did not hold that front pay can be "legally foreclosed" by subsequent employment. In *Dotson*, the district court denied front pay because it was unduly speculative and because the plaintiff was otherwise made whole through liquidated damages. *Dotson, supra*, at 300. Dotson says nothing about legally foreclosing front pay due to subsequent employment history and the phrase "28% less" does not appear in the case. Similarly, *Dominic v. Consol. Edison Co. of N.Y., Inc.*, 822 F.2d 1249 (2d Cir. 1987) does not hold that front pay can be "legally foreclosed" based on subsequent employment history. Rather, in *Dominic,* the district court reduced the front pay to account for the difference between what he would have made and what he was currently earning at a replacement job. *Dominic, supra,* at 1258. This is precisely the methodology used by Dr. Moore in the instant case.

The law related to mitigation of damages is far more fluid and flexible than WF represents to the Court. Importantly, WF has the burden of proof on the issue, not Billesdon, which it did not and can not meet. *E.E.O.C. v. Consol Energy, Inc*., 860 F.3d 131, 148 (4th Cir.

2017) (defendant employer must show plaintiff was not "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged.") A plaintiff's economic and personal circumstances, including his age, are relevant considerations for determining if he reasonably mitigated his wage damages. See *id*. at 149. To fulfill his duty to mitigate damages, a claimant "need not go into another line of work, accept a demotion, or take a demeaning position." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). Neither full-time employment nor employment in the same field is necessarily required, so long as the plaintiff did not act in bad faith by accepting a certain job. See *E.E.O.C. v. CTI Glob. Sols., Inc.*, 815 F.Supp.2d 897, 912 (D. Md. 2011). As such, WF has not shown that the jury's award of $14 million in front pay is against the clear weight of the evidence.

**D.      Neither the emotional distress nor the punitive damages should be reduced.**

WF does not articulate any legal basis for a new trial on emotional distress and/or punitive damages. The $100,000 in emotional distress damages is proper and within any statutory limits under both the ADA and the WDPP. The $1 million in punitive damages is proper and within any statutory limits under the WDPP. Although Billesdon agrees punitive damages would be capped under the ADA, WF's argument is hypothetical at this point. As shown above, there is no basis for setting aside the jury's verdict in favor of WDPP claim, so there is thus no basis for setting aside the emotional distress or punitive damages related to that claim. There is also no basis for setting aside the ADA discrimination claims, so there is no basis for setting aside the emotional distress or punitive damages associated with those claims.

**VII.     CONCLUSION**

For the foregoing reasons, Plaintiff Christopher John Billesdon respectfully requests this Court deny Defendant Wells Fargo Securities, LLC's Motion For Judgment As A Matter Of Law,

Or In The Alternative, For A New Trial And To Alter Or Amend The Judgment.

Respectfully submitted this 9th day of September 2024.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NCSB#26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH 3:24-mc-104

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NCSB#26590
GESSNERLAW, PLLC
602 East Morehead Street
Charlotte, North Carolina 28202
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*